*539 GILLETTE, J.
In 1985, the legislature enacted a criminal statute directed at the producers, purveyors, and purchasers of visual reproductions of children engaged in sexually explicit conduct. In 1990, defendant was charged with violating one section of that statute, codified at ORS 163.680 (1987), by purchasing a magazine and a video that allegedly contained portrayals of the proscribed type. At that time, ORS 163.680 provided:
“(1) It is unlawful for any person to pay or give anything of value to observe sexually explicit conduct by a child known by the person to be under 18 years of age, or to pay or give anything of value to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age.
“(2) Violation of subsection (1) of this section is a Class C felony.”[1]
Defendant demurred, arguing that ORS 163.680 (1987) violated Article I, section 8, of the Oregon Constitution.[2] The trial court sustained defendant’s demurrer, and a divided Court of Appeals, sitting in banc, affirmed that ruling. State v. Stoneman, 132 Or App 137, 888 P2d 39 (1994).
We allowed the state’s petition for review in order to address the constitutional question posed by this statute. For the reasons that follow, we conclude that ORS 163.680 (1987) did not violate Article I, section 8. We therefore reverse the decision of the Court of Appeals.
It is important at the outset to note that the portion of ORS 163.680 (1987) involved in this case criminalized only *540 the purchase of a very limited and specific kind of material, i.e., the statute dealt exclusively with commerce in visual reproductions — materials that employ photographic or video-graphic methods to reproduce an event. [3] The statute’s reach further was confined by the requirement that those visual reproductions depict actual children engaged in “sexually explicit conduct.”[4] Thus, materials that merely offer the illusion that actual children are involved (as, for instance, when the subjects are over the age of 18 but appear to be younger) were not included within the statute. Moreover, the child’s participation in the act must be real, i.e., the sexual act may be “simulated,” but the child’s participation in that act cannot be.[5]
A necessary consequence of those legislative limitations is that the photographs and films described in ORS *541 163.680(1) (1987) can be produced only if someone photographs, films, engages in, or solicits sexual conduct by children — individuals unable by virtue of their age to give their informed consent to such activity. And, because such activities, by their very nature, are abusive to children, it follows that a violation of ORS 163.680(1) (1987) necessarily involves the purchase of material that is directly and inextricably connected with sexual abuse of children.
Ultimately, it is that fact that frames the central legal question posed by this case: Did the focus of ORS 163.680 (1987), i.e., the focus on sexual abuse of children, set the statute apart from the type of anti-obscenity laws that this court held to be invalid restrictions on speech in City of Portland v. Tidyman, 306 Or 174, 759 P2d 242 (1988), and State v. Henry, 302 Or 510, 732 P2d 9 (1987)?[6]
To answer that question, we begin, as did the court in Henry, by noting the breadth of our state’s constitutional guarantee of free expression. The text of that guarantee extends not only to written and spoken communications, but also to verbal and nonverbal expressions in film, photographs, and the like. Henry, 302 Or at 515. It embodies a right to be free of restrictions that are “written in terms describing the forbidden content of [the expression.]” Tidyman, 306 Or at 179. Put differently, Article I, section 8,
“forecloses the enactment of any law written in terms directed to the substance of any ‘opinion’ or any ‘subject’ of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.”
State v. Robertson, 293 Or 402, 412, 649 P2d 569 (1982).
*542 The state first argues that, because the welfare of children is at stake, we should apply a different, and less stringent, rule than the one stated above. In particular, the state urges us to follow federal constitutional jurisprudence by balancing the state’s strong interest in protecting children against the relatively insignificant burden that the statute imposes on free expression. In support of that argument, the state adverts to various comments embedded in the opinions issued by this court, each of which purportedly supports the notion that Article I, section 8, is, at times, susceptible to judicial balancing. See, e.g., In re Fadeley, 310 Or 548, 561, 802 P2d 31 (1990) (free speech “may be curtailed, for example, in the regulation of certain professions”); Tidyman, 306 Or at 192 (Gillette, J., concurring in part and specially concurring in part) (“The right of the city, a county or the state to enact legislation to protect the welfare of children approaches the plenary.”).
We think, however, that the balancing approach for which the state contends is so contrary to the principles that have guided this court’s jurisprudence respecting freedom of expression issues under Article I, section 8, that it cannot be countenanced. It is axiomatic that, among the various interests that the government of this state seeks to protect and promote, the interests represented by the state constitution are paramount to legislative ones. Consequently, a state legislative interest, no matter how important, cannot trump a state constitutional command. See Oregonian Publishing Co. v. O’Leary, 303 Or 297, 305, 736 P2d 173 (1987) (“The government cannot avoid a[n unqualified] constitutional command by 'balancing’ it against another of its obligations.”); see also Deras v. Myers, 272 Or 47, 54 n 6, 535 P2d 541 (1975) (suggesting that balancing approach is incompatible with Oregon’s freedom of expression guarantee). Article I, section 8, does guarantee freedom of expression without qualification— “No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever” (emphasis added) — and is, consequently, incompatible with a balancing approach.
We reject the state’s suggestion that we abandon the rule that the court traditionally has employed in resolving Article I, section 8, issues, in recognition of the particular *543 importance of the legislative objective at issue here. We must, and will, apply that rule to resolve the free speech issue that is now before us.[7]
We begin that exercise by deciding whether ORS 163.680 (1987) was on its face “written in terms directed to the substance of any ‘opinion’ or any ‘subject’ of communication.” Robertson, 293 Or at 412. A statute that is so written is invalid on its face, unless it fits “wholly” within some “historical exception.” Id.[8]
 If the enactment’s restraint on speech or communication lies outside an historical exception, then a further inquiry is made — whether the actual focus of the enactment is on an effect or harm that may be proscribed, rather than on the substance of the communication itself. If the actual focus of the enactment is on such a harm, the legislation may survive scrutiny under Article I, section 8. See discussion below at 544-45; State v. Moyle, 299 Or 691, 695, 705 P2d 740 (1985) (so holding); see also Tidyman, 306 Or at 184 (coercion statute at issue in Robertson was valid because it forbade compelling or inducing unwilling behavior — the harmful effect— by means of specified kinds of threats; it did not forbid threats as such). If such a statute expressly prohibits certain forms of expression, it must survive an overbreadth inquiry before it can be found constitutional.
Even statutes that do not by their terms implicate speech or expression — i.e., statutes that are by their terms aimed only at “effects” — also are subject to challenge under Article I, section 8, on vagueness grounds or on the ground that the statute’s reach, as applied to defendant, extends to privileged expression. State v. Plowman, 314 Or 157, 164, *544 833 P2d 558 (1992); Robertson, 293 Or at 417-18. Finally, and even if a restraint on freedom of speech or expression cannot be justified under any of the foregoing considerations, it may nonetheless be justified under the “incompatibility exception” to Article I, section 8. See, e.g., In re Lasswell, 296 Or 121, 125-26, 673 P2d 855 (1983) (incompatibility of full range of expression with obligations of particular public office).[9] We now proceed with our step-by-step inquiry.
The Court of Appeals majority concluded that ORS 163.680 (1987) focused on the content of the films and photographs that it described and invalidated the statute on that ground. Stoneman, 132 Or App at 143-44. In so holding, that court first discussed the difference between statutes that are directed at speech itself and those that are directed at harmful effects. It concluded that, because the statute described and proscribed communicative materials that depict children engaged in sexually explicit conduct and, more importantly, because the statute made no mention of preventing any supposed harmful effects, ORS 163.680 (1987) necessarily focused on the content of speech. Id.[10]
The flaw in that analysis is that it asks more of the statute in question than is required by Article I, section 8. It is true, as the Court of Appeals recognized, that the universe of statutes may be divided initially into two categories— those that focus on the content of speech and those that focus on the effect of speech. But, as the summary of our methodology’s four steps indicates, a reviewing court’s work is not over when a statute is placed into one or another of those general classifications. Because the statute in question described and prohibited commerce in certain forms of communication, it *545 must be examined under one or the other of the first two categories identified in Robertson and reiterated in Plowman.
Under the first category, the statute could pass constitutional muster only if the restraint that it imposed falls “wholly” within some historical exception. The state points to and relies on Statutes of Oregon 1854, chapter XI, section 10, pp 210-11, as establishing an “historical exception.”[11] That territorial law was directed at persons who “import, print, publish, sell or distribute [matter] containing obscene language or obscene prints * * * manifestly tending to the corruption of the morals of youth.” But, as this court noted in Henry, that territorial statute “contained no definition of ‘obscene’ and * * * was directed primarily to the protection of youth.” 302 Or at 522. Consequently, this court concluded in Henry that the territorial statute provided no support for any “well-established historical exception to freedom of expression.” Id. We agree with the Court of Appeals majority that, without more, that territorial statute did not sufficiently and clearly establish an historical exception within which the statute under review in the present case could be said “wholly” to fall. Stoneman, 132 Or App at 147. But, while it does not establish the historical exception for which the state contends, the territorial statute does inform our inquiry concerning the alternative ground for sustaining the statute, viz., that the statute was aimed at preventing a harm.
With respect to this second category, we think that it is clear that ORS 163.680 (1987) was concerned with harm to children. The Court of Appeals majority was wrong in holding to the contrary merely because the statute did not describe the communication, the commerce in which is forbidden, specifically in terms of harmful effects. Stoneman, 132 Or App at 144. The proper focus is on what the statute did proscribe, rather than on what it did not.
It is true that, when viewed in isolation, ORS 163.680 (1987) appears to have contained a content-based proscription on expressive material. It forbade commerce in certain forms of expression — films, videotapes, and the like— *546 in terms of their content — “sexually explicit conduct by a child under 18 years of age.” But a statute cannot be read in a vacuum. An examination of the context of a statute, as well as of its wording, is necessary to an understanding of the policy that the legislative choice embodies. See PGE v. Bureau of Labor and Industries, 317 Or 606, 610-11, 859 P2d 1143 (1993) (first level of interpretation of statute involves examining both text and context). A closer look at the provision under examination here, within its statutory context, reveals a different focus.
We note, first, that ORS 163.680 (1987) prohibited commerce in material, the production of which necessarily involves harm to children.[12] In fact, it is that aspect of the films and photographs described in ORS 163.680 (1987), i.e., their relationship to harm to children, rather than their communicative substance, that sets them apart. In other words, ORS 163.680 (1987) prohibited the purchase of “visual reproduction [s] of sexually explicit conduct by a child under 18 years of age,” not in terms of the content of those reproductions, but because they owe their very existence to the commission of sexual abuse of a child and are, consequently, an extension of that harmful act — one that may, in many instances, provide an economic incentive to abuse the child.
The legislature’s enactment of ORS 163.683 (1987), which had the effect of modifying ORS 163.680 (1987), is relevant to the foregoing distinction. ORS 163.683 (1987) provided:
“It is an affirmative defense in any prosecution under ORS 163.680 alleging the obtaining or viewing of a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child that the production of the photograph, motion picture, videotape or other *547 visual reproduction did not violate laws prohibiting production of such visual reproductions in the jurisdiction where it was produced and that, if imported into the United States, was done so lawfully.”[13]
That is, ORS 163.683 (1987) established that it was legal to purchase a visual reproduction whose “substance” is identical to that of the material described at ORS 163.680 (1987), so long as that reproduction is not the product of an act of actual sexual abuse of a child. ORS 163.680 (1987) thus was directed at commerce in the materials described in the statute only because they are the products of sexual exploitation of children. Its constitutionality must be reviewed in that light.
Other parts of the context in which ORS 163.680 (1987) was found confirm that the statute was directed at discouraging the underlying harm caused by child sexual abuse, rather than at the substance of the films and photographs that are described therein. ORS 163.680 (1987) was only one provision among several devoted to visual recording of sexual conduct by children. That part began with a definition of “sexually explicit conduct” at ORS 163.665 (1987), set out above at note 4, and then at ORS 163.670 (1987), which forbade the use of children in displays of sexually explicit conduct:
“(1) A person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels, and or induces a child under 18 years of age to participate or engage in sexually explicit conduct for any person to observe or to record in a photograph or other visual recording.
“(2) Violation of subsection (1) of this section is a Class A felony.”[14]
ORS 163.670 (1987) described the basic and most serious kind of harm covered by this part of the criminal code[15] and set out the theme that is common to a variety of subsidiary *548 offenses that are described in the remainder of that part: the state’s determination to deter the harm that arises from participation of children in sexually explicit conduct for the purpose of visual recording.
For example, ORS 163.673 (1987) prohibited “dealing in” visual recordings of children under 18 years of age engaged in sexually explicit conduct, while ORS 163.677 (1987) prohibited the knowing transport into the state of visual depictions of children engaged in such conduct.[16] Another provision, ORS 163.693 (1987), penalized failure to report visual recordings of children under the age of 18 engaged in sexually explicit conduct by persons involved in processing and producing them,[17] while ORS 163.680 (1987), the provision at issue here, prohibited payment to obtain or view such depictions.
The consistent repetition of the legislature’s theme establishes that, not only the basic forbidden act described at ORS 163.670 (1987), but the entire part of the criminal code in which that statute is found, was aimed at preventing and punishing conduct — the subjection of children under 18 years of age to sexual exploitation for the purposes of visual recording. Although the various subsidiary activities described in that portion of the law — distribution, purchase, and transport of the resulting photographs and videotapes — -involve communication, the legislative focus was not on the message or “substance” of the photographs and videotapes but, rather, on their undeniable relationship to the underlying acts of sexual exploitation of children.
We conclude that ORS 163.680 (1987) prohibited the purchase of certain communicative materials, not in terms of their communicative substance, but in terms of their status as the products of acts that necessarily have harmed the child participants. So understood, it will be seen that the statute punished sexual exploitation by commerce that is a continuation and an integral part of the underlying harmful acts.
*549 The foregoing conclusion leaves us with a single question: May the legislature regulate commerce in communicative products derived from actual sexual exploitation of children? We have little difficulty in concluding that the legislature may do so, where the manufacture of those products for distribution and eventual purchase provides the very raison d’etre for engaging in the underlying acts of child sexual abuse.[18] A state’s authority to forbid direct harm to children includes the authority to destroy the incentives for causing that harm,[19] at least when the incentive is to sell to others a visual reproduction of the harmful act itself.[20]
*550 ORS 163.680 (1987) was not directed at the substance of any opinion or subject of communication but was, instead, directed at protecting children from sexual exploitation. As such, it did not violate Article I, section 8, by its direct terms. Still, because it expressly prohibited a certain form of expression, we must determine whether it reached expression that enjoys the protections afforded by Article I, section 8. If its apparent reach extended to privileged expression and it cannot be interpreted narrowly to avoid privileged expression, then it is overbroad and invalid. Plowman, 314 Or at 164; Robertson, 293 Or at 417-18, 437.
We already have noted that ORS 163.680 (1987) prohibited commerce of a very limited pool of communicative materials — those whose production and, by extension, use, necessarily involve the harming of a child. Article I, section 8, does not require the state to tolerate sexual abuse of children. ORS 163.680 (1987) went no further than to punish commerce that is a direct fruit of that abuse. So understood, the reach of ORS 163.680 (1987) was narrowly tailored to reach only forbidden effects and did not extend to privileged expression.
We hold that Article I, section 8, of the Oregon Constitution, does not prohibit the legislature from protecting children from sexual exploitation, even when that exploitation ultimately is shared with others through some expressive device. ORS 163.680 (1987) was constitutionally valid.[21] The Court of Appeals erred in concluding otherwise.
The decision of the Court of Appeals is reversed. The case is remanded to the circuit court for further proceedings.

 ORS 163.680 was amended in 1991 in minor ways that are not relevant to this case. Or Laws 1991, ch 664, § 8. In 1995, the legislature repealed ORS 163.680 as part of an overall revision of the laws relating to visual reproductions of child sexual conduct. Or Laws 1995, ch 768, § 16. The purchase of visual reproductions of child sexual conduct is now prohibited under a new section pertaining to “encouraging child sexual abuse.” Or Laws 1995, ch 768, § 3 (ORS 163.686 (1995)).

 Article I, section 8, provides:
“No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right.”

 Defendant argued below that the term “visual reproduction” in ORS 163.680 (1987) could apply to paintings, drawings, and other “renderings from imagination rather than life.” We disagree. Under the principle of ejusdem generis, that term is limited to media that, like other media listed in the statute — i.e., photographs, motion pictures, and videotapes — reproduce actual events involving children taking part in the acts being portrayed.

 In 1990, “sexually explicit conduct” was defined as “actual or simulated:
“(1) Sexual intercourse or deviant sexual intercourse;
“(2) Genital-genital, oral-genital, anal-genital or oral-anal contact, whether between persons of the same or opposite sex or between humans and animals;
“(3) Penetration of the vagina or rectum by any object;
“(4) Masturbation;
“(5) Sadistic or masochistic abuse; or
“(6) Lewd exhibition of the genitals or anus.”
ORS 163.665(3) (1987). In 1991 and again in 1995, ORS 163.665(3) was amended in minor ways not relevant to this case.

 The dissent takes a completely different view of the meaning and scope of the word “simulated.” Even if we were to agree that the dissent’s interpretation of the word were a reasonable one — and, reading the word in its statutory text and context, we do not — the dissent’s argument would not go where the dissent wishes to go. Two plausible readings would require this court to resort to legislative history. PGE v. Bureau of Labor and Industries, 317 Or 606, 611-12, 859 P2d 1143 (1993). The dissent presents no history — and we know of none — to support its theory. That circumstance then would lead us to resort to general maxims of statutory construction. Id. at 612. One such maxim is that a court will give a statute such an interpretation as will avoid constitutional invalidity. See, e.g., Salem College & Academy, Inc. v. Emp. Div., 298 Or 471, 481, 695 P2d 25 (1985) (so holding). We already have achieved such an interpretation by our first-level analysis.

 In Henry, this court concluded that expression cannot be outlawed solely on the ground that it is obscene. 302 Or at 525. However, the court left open the possibility that obscenity could be regulated, like other forms of expression, under “reasonable time, place and manner regulations of the nuisance aspects of such material, or laws to protect the unwilling viewer or children.” Id. (Emphasis added.) A year later, in Tidyman, this court invalidated a City of Portland zoning ordinance directed at “adult” bookstores and movie theaters, because we held that the city’s claim that the ordinance focused on the effects of speech, rather than on its substance, was incorrect. 306 Or at 185-86.

 The foregoing conclusion rejects the state’s contention that the reference in Henry, 302 Or at 525, to the protection of children should result in a balancing test. Nothing in this opinion, however, should be construed to reflect on the continuing vitality of the implication in Henry, id. at 521-22, 525, that the protection of children may constitute an historical exception when assessing the scope of Article I, section 8, thereby removing any state constitutional bar to a statute that is directed at the content of speech but that also falls within the ambit of the exception.

 Of course, an enactment may fit only partly within an historical exception. In such a case, the enactment still must be scrutinized and invalidated to the extent that it forbids privileged speech or expression.

 The “incompatibility exception” is not implicated in this case.

 The Court of Appeals likened ORS 163.680(1) to the ordinance at issue in City of Portland v. Tidyman, 306 Or 174, 759 P2d 242 (1988). That ordinance prohibited “adult businesses” from locating near residential areas and schools. Although the ordinance contained prefatory findings reciting the deleterious effects that adult businesses cause if located in residential areas, it did not include those effects as an element of the regulatory standard. We held that the statute was an invalid content-driven restriction on speech, because the operative text of the statute described the forbidden businesses in terms of the content of their communicative products and did not specify effects that must occur or imminently threaten to occur if the statute were to apply. 306 Or at 185.

 One of the dissenting opinions in the Court of Appeals agreed with that argument. State v. Stoneman, 132 Or App 137, 156-62, 888 P2d 39 (1994) (Edmonds, J., dissenting).

 Subjecting children to sexual conduct is a crime under a number of Oregon statutes. Under ORS 163.427 (Sexual Abuse in the First Degree), it is a Class B felony to subject another person to sexual contact if the victim is less than 14 years of age. Under ORS 163.415 (Sexual Abuse in the Third Degree), it is a Class A misdemeanor to subject another person to sexual contact if the victim is incapable of consent by reason of being under 18 years of age. Under ORS 163.435 (Contributing to the Sexual Delinquency of a Minor), it is a Class A misdemeanor to engage in sexual intercourse with a person under 18 years of age, or to cause such a person to engage in deviate sexual intercourse with another person.

 ORS 163.683 (1987) was repealed by Or Laws 1991, ch 664, § 12.

 ORS 163.670 (1987) was amended by Or Laws 1991, ch 664, § 5.

 While we speak here of criminal statutes, because ORS 163.680 (1987) is a part of the criminal code, it is not the criminality of the forbidden conduct that is pivotal to our analysis. What is pivotal is the fact that the forbidden conduct necessarily involves harm to children.

 Both ORS 163.673 (1987) and ORS 163.677 (1987) were repealed by Or Laws 1995, ch 768, § 16.

 ORS 163.693 (1987) was amended by Or Laws 1991, ch 664, § 10, in minor ways not relevant to this case.

 This conclusion is consistent with the rationale of City of Eugene v. Miller, 318 Or 480, 871 P2d 454 (1994). Miller indicates that legislation is not immunized from Article I, section 8, scrutiny by the mere fact that it regulates expressive material as it does any other commodity:
“The city also is wrong when it contends that ‘the analysis in this case is the same whether the commodity involved is joke books or furniture.’ A limitation on the sale of furniture does not implicate the same free speech concerns that are implicated by a limitation on the sale of goods that are themselves protected as expression under Article I, section 8.”
318 Or at 487. However, Miller does not suggest that legislation affecting commerce in the communicative by-products of child sexual abuse implicates the protections of Article I, section 8.

 See, e.g., Laurence Tribe, American Constitutional Law, ch 12, §§ 12-16, 915 n 71 (2d ed 1988):
“Until recently, research and writing stressed, for example, the rather tenuous link to crime by the viewer or reader of the obscene. Consistently overlooked as a rationale for banning at least some types of films had been the link to crime by the persons being filmed. Governmental power to prevent murder, rape, and child abuse, for example, should imply power to destroy the primary economic incentive for a distinct category of abusive acts: the desire to film the criminal abuse itself for the titillation of a potential audience jaded by its satiation with other sights and sounds. Although governments cannot be allowed the circular argument that films of consenting adult sex should be banned in order to diminish an economic incentive for fornication that might be too private to be punishable but for the fact that the acts are being filmed for viewing by others, no circle is involved when the argument is applied to films of child torture and mutilation. * * * It should oe noted that this rationale does not apply to descriptions as opposed to actual photographs or recordings. Nor does it apply to films of simulated acts, or to films of conduct causing no harm other than that supposedly caused by the act of viewing.” (Emphasis in original.)

 We note that various federal laws — for instance, the laws forbidding copyright infringement and commerce in trade secrets — regulate communicative material under the foregoing rationale. See American Booksellers Ass’n, Inc. v. Hudnut, 771 F2d 323, 332 (7th Cir 1985) (noting that a motion picture that is the product of coerced activity could be banned as part of the underlying coercion), aff'd 475 US 1001, 106 S Ct 1172, 89 L Ed 2d 291 (1986); New York v. Ferber, 458 US 747, *550 761-62, 102 S Ct 3348, 73 L Ed 2d 1113 (1982) (stating that child pornography maybe regulated as an integral part of the abuse that produced that pornography, and quoting Giboney v. Empire Storage & Ice Co., 336 US 490, 498, 69 S Ct 684, 93 L Ed 834 (1949): “ ‘It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.’ ”).

 We emphasize again that the permissible reach of this statute extended only so far as is required for the protection of children from the harm inherent in sexual exploitation.