Argued and submitted March 27, affirmed July 9, petition for review denied
October 7, 1997 (326 Or 62)

## OREGON STATE BAR,
a public corporation,
*Respondent,*

*v.*

## Robin SMITH,
and People's Paralegal Service, Inc.,
an Oregon corporation,
*Appellants.*

(C94-0597CV; CA A89206)

942 P2d 793

Thomas J. Mack, Washington, D.C., argued the cause for appellants. With him on the briefs were Stuart A. Sugarman, Portland, Oregon, and Stephen B. Mercer, Silver Spring, Maryland.

Allen Reel argued the cause and filed the brief for respondent.

Before Deits, Chief Judge, Haselton, Judge, and Richardson, Senior Judge.

HASELTON, J.

## HASELTON, J.

Defendants, People's Paralegal Service, Inc., and its president, Robin Smith, appeal from a judgment declaring them to have engaged in activities that constitute the unauthorized practice of law, ORS 9.160, and enjoining them from those activities. ORS 9.166. They argue that the injunction violated rights of free expression under the Oregon Constitution, Article I, section 8, and due process under the First and Fourteenth Amendments to the United States Constitution. We affirm.

From 1987 until 1995, when the injunction issued, defendants operated a business providing "legal technician" services for a fee. The services included providing consumers[1] with various legal forms available to the public through such sources as Stevens Ness Publishing Company, NOLO PRESS, bankruptcy courts, and the Oregon State Bar, and advising them with respect to their individual legal concerns.[2] Defendants never attempted to represent consumers in court, nor did they sign any documents as attorneys. Moreover, People's Paralegal posted signs at its place of business advising consumers that its employees were not attorneys, and its intake sheets, which were signed by the consumers, included the following statement:

> "WE ARE NOT ATTORNEYS. WE ARE LEGAL TECHNICIANS. OUR SERVICE PROVIDES PREPARATION OF THE PAPERS INCLUDING TYPING, NOTARY SERVICE, AND PROCEDURAL INFORMATION. * * * IF YOU REQUIRE LEGAL ADVICE PLEASE SEE AN ATTORNEY."

---

[1] We use the ambiguous, and perhaps infelicitous, term "consumers"—rather than "clients" or "customers" quite consciously. Either of the latter two terms implicitly decides the central question before us.

[2] The trial court made specific findings regarding six different occasions when People's Paralegal advised consumers as to their specific legal problems on issues including service of process, persons entitled to notification and proper venue in guardianship proceedings, legal issues that arise in marital dissolution proceedings, such as property settlements, including obtaining a Qualified Domestic Relations Order, and child support, how to obtain legal custody of a child, and how to amend a complaint. In some of these cases, People's Paralegal's advice was incorrect and ultimately harmed the consumers.

Nevertheless, defendants did provide legal advice to consumers, and some of those persons relied on defendants' advice in resolving their legal problems.

Plaintiff Oregon State Bar brought this action in April 1995, alleging that defendants were engaged in the unlawful practice of law under ORS 9.160 and seeking injunctive relief under ORS 9.166.[3] Defendants answered and asserted, *inter alia*, affirmative defenses that ORS 9.160, either facially or as applied, violated rights of free expression under Article I, section 8, of the Oregon Constitution and also violated constitutional due process guarantees. The trial court disagreed and granted the injunction, which provided, in part:

"[Defendants] * * * are * * * enjoined from practicing law including:

"1. Enjoined from any personal contact with any persons in the nature of consultation, explanation, recommendation, or advice regarding their legal matters.

"2. Enjoined from meeting with any persons to discuss their individual facts and circumstances relating to their need or desire for legal forms, legal services or legal assistance.

"3. Enjoined from obtaining information orally, in writing, or in any other manner relating to individual facts and circumstances so as to assist any persons with their legal matters.

"4. Enjoined from advising any persons regarding their eligibility for or advisability of legal remedies to address any person's particular legal matters.

---

[3] ORS 9.160 provides:

"Except for the right reserved to litigants by ORS 9.320 to prosecute or defend a cause in person, no person shall practice law or represent that person as qualified to practice law unless that person is an active member of the Oregon State Bar."

ORS 9.166 provides, in part:

"(1) If the [Board of Governors of the Oregon State Bar] has reason to believe that a person is practicing law without a license, the board may maintain a suit for injunctive relief in the name of the Oregon State Bar against any person violating ORS 9.160. The court shall enjoin any person violating ORS 9.160 from practicing law without a license."

"5.    Enjoined from advising any persons regarding procedural functions of the court system as it relates to any person's particular legal matters including advice regarding jurisdiction or venue.

"6.    Enjoined from assisting in selecting particular forms, documents or pleadings for any persons to address their legal matters.

"7.    Enjoined from assisting in any way with the preparation or filling out of legal forms, or any parts of such forms, documents or pleadings for any persons.

"8.    Enjoined from assisting, suggesting or advising any persons how forms, documents or pleadings should be used to address or to solve particular legal problems.

"9.    Nothing included in this Judgment and Decree precludes Defendant Smith from working for someone authorized to practice law so long as she is acting within the course of her duties and under the direction and supervision of an individual authorized to practice law."

On appeal, defendants renew and reiterate their constitutional challenges to ORS 9.160, both on its face and as applied. We begin with defendants' free expression arguments under Article I, section 8. Article I, section 8, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

Defendants' principal argument is that, because the practice of law necessarily involves the "exchange of legal information," ORS 9.160 impermissibly prohibits, or impairs, constitutionally protected expression. Plaintiff responds that the statute does not explicitly refer to expression or to the content of expression. Rather, plaintiff argues, the statute is merely directed to regulating the practice of a profession, which, like many other professions, involves expression. Thus, plaintiff reasons, ORS 9.160 does not embody an impermissibly "content-driven" restriction of expression. Before addressing those arguments, it is useful—indeed, essential—to briefly review the history of the regulation of law practice in Oregon.

During territorial times and for the first 60 years of Oregon's statehood, restrictions on the practice of law were minimal. That relative lack of regulation appears to have been a product of post-Jacksonian and, later, populist hostility to a perceived professional elite. Barlow F. Christensen, *The Unauthorized Practice of Law: Do Good Fences Really Make Good Neighbors—or Even Good Sense?*, 1980 Am B Foun Res J 159, 169-74.[4] The restrictions that were imposed pertained solely to litigation practice—that is, to qualifications to appear before courts and to sign pleadings. There were few, if any, restrictions on the rendition of general out-of-court legal advice.[5]

The only pre-statehood regulation of law practice we have located is a rule that the Supreme Court of the Oregon Territory published in 1852, which addressed practice in that court:

---

[4] *See Unauthorized Practice of Law* at 172:

"A product of frontier conditions, this egalitarian spirit, which held any man capable of doing anything, gave real impetus to the movement to open up the practice of law to any who might wish to pursue it, without regard to educational or other qualifications. As Pound put it, 'As to the law, the formative era is one of upbuilding. As to the profession, it is one of a vain struggle to maintain what had been achieved at the time of the Revolution.' " (Footnotes omitted.)

[5] *See id.* at 173-74:

"Legislation in New Hampshire in 1842 provided that every citizen over 21 years of age might practice law, without any other qualifications. In 1843 legislation opened up the practice of law in Maine to every citizen, and a similar Wisconsin law of 1848 gave the privilege of law practice to every resident. A provision of the 1851 Indiana constitution extended to every voter the privilege of practicing law. As a practical matter, then, by the time of the Civil War there were no significant restrictions on admission to law practice.

"* * * * *

"* * * Because the practice of law was open to virtually anyone, there was little cause for unauthorized practice; those who might otherwise have been unauthorized practitioners could now, with virtually no effort, be duly recognized as attorneys. And, under the permissive conditions that existed from the early nineteenth century until well after the Civil War, even those who might not have bothered to seek admission to law practice would have found little to inhibit their law practice activities." (Footnotes omitted.)

*See also* Commission on NonLawyer Practice, American Bar Association, *Non-Lawyer Activity in Law-Related Situations* 15 (1995) ("In the 19 new states admitted to the union between independence and 1860, the earliest colonial era model of an untrained and unregulated bar—even for appearance in court—was replicated.").

"1.   Attorneys and counsellors at law, and solicitors in chancery, of the several District Courts of this territory, shall on notice in open court, be admitted to practice in the Supreme Court; but all the preliminary steps necessary to bring a cause to this court, and prepare the same for trial, may be taken by any attorney, solicitor or counsellor of any of the District Courts." Rules Adopted at the Supreme Court of Oregon Territory (December Term 1952).

In 1862, Oregon enacted legislation that provided that "no person shall be allowed to participate as an attorney or appear as counsel in any court of justice" unless admitted to practice by the State Supreme Court.[6] At the same time, the legislature enacted a statutory definition of "attorney":

"An attorney is a person authorized to appear for and represent a party, in the written proceedings in any action, suit or proceeding, in any stage thereof. An attorney, other than the one who represents the party in the written proceedings, may also appear for and represent a party in court, before a judicial officer, and then he is known, in the particular action, suit or proceeding, as counsel only, and his authority is limited to the matters that transpire in the court or before such officer at the time." General Laws of Oregon, ch 14, § 1000, p 397 (Civ Code) (Deady 1845-64).

The legislature also prescribed requirements for admission as an attorney[7] and codified a summary of attorneys' duties.[8]

---

[6] General Laws of Oregon, ch 14, § 1002, p 398 (Civ Code) (Deady 1845-64).

[7]   "An applicant for admission as attorney must apply to the supreme court, and must show:

"1. That he is a citizen of the United States, and of this state, and of the age of twenty-one years, which proof may be made by his own affidavit;

"2. That he is a person of good moral character, which may be proved by any evidence satisfactory to the court;

"3. That he has the requisite learning and ability, which must be shown by the examination of the applicant, by the judges, or under their direction, in open court, at the term at which the application is made." General Laws of Oregon, ch 14, § 1003, p 398-99 (Civ Code) (Deady 1845-64).

[8]   "It is the duty of an attorney:

"1. To support the constitution and laws of the United States, and of this state;

"2. To maintain the respect due to the courts of justice and judicial officers;

"3. To counsel or maintain such actions, suits or proceedings or defenses, only, as may appear to him legal and just, except the defense of a person charged with a public offence;

In 1919, the legislature enacted Oregon's first statute addressing the unlawful practice of law:

> "It shall be unlawful for any person, firm, association of persons or corporation to engage in the practice of law within the state of Oregon after the taking effect of this act, without first having been duly admitted and licensed as an attorney at law in the courts of this state." Oregon Laws 1920, ch V, § 1093-1, p 949 (Spec Sess).[9]

The legislature concomitantly enacted a definition of the "practice of law":

> "Any person, firm, association of persons or corporation shall be regarded as engaging in the practice of law within the meaning of this act who shall undertake to represent or who shall represent parties litigant in courts of justice other than courts of justices of the peace, or district courts, or who shall, for a fee, prepare or undertake to prepare pleadings or other papers incident to actions, suits or special proceedings, or manage or undertake to manage such actions, suits or proceedings on behalf of clients before judges or courts, or in any manner act professionally in legal formalities, negotiations or proceedings, by warrant or authority of clients or otherwise[.]" Oregon Laws 1920, ch V, § 1093-2, p 949 (Spec Sess).

That definition encompassed litigation practice, which was the focus of earlier definitions of "attorney," as well as broader matters of client representation, *i.e.*, "act[ing] professionally in legal formalities, negotiations or proceedings by

---

"4. To employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never to seek to mislead the court or jury, by any artifice or false statement of law or fact;

"5. To maintain, inviolate, the confidence, and at every peril to himself, to preserve the secrets of his clients;

"6. To abstain from all offensive personality, and to advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he is charged;

"7. Not to encourage either the commencement or the continuance of an action, suit or proceeding, from any motives of passion or interest; and,

"8. Never to reject, for any consideration personal to himself, the cause of the defenseless or the oppressed." General Laws of Oregon, ch 14, § 1006, p 399-400 (Civ Code) (Deady 1845-64).

[9] Violation of that statute was a misdemeanor, which could be punished by a fine of not more than $100, imprisonment in the county jail for a period of not more than 90 days, or both. Oregon Laws 1920, ch V, § 1093-3, p 949 (Spec Sess).

warrant or authority of clients or otherwise[.]" However, it did not refer to, much less purport to regulate, the rendition of general, nonlitigation-related advice.

In 1937, the legislature deleted the definition of the "practice of law" from the unlawful practice statutes. Or Laws 1937, ch 343, § 2. Thereafter, the law simply provided:

> "Reserving to litigants the rights * * * to prosecute or defend a cause in person, it shall be unlawful for any person to practice law or to represent himself as qualified to practice law after the taking effect of this act, unless he shall be an active member of the Oregon state bar * * *. Any person who is an active member of the Oregon state bar, * * * or who hereafter shall become such active member, hereby is authorized to engage in the practice of law." Or Laws 1937, ch 343, § 1.

That open-ended—and, arguably, amorphous—approach was characteristic of contemporaneous unauthorized practice statutes enacted in other jurisdictions. *See The Unauthorized Practice of Law* at 192. In Oregon, as in many other jurisdictions, the particularized definition of the "practice of law" was committed to case-by-case development by the courts.

The first Oregon decision to address that question was *State ex rel. Oregon State Bar v. Johnston*, 158 Or 52, 74 P2d 395 (1937). In *Johnston*, a disbarred attorney was fined for continuing to practice law. The court noted that the defendant

> "continued to occupy an office in the city of Portland, on the door of which appeared a sign reading, 'Harold W. Johnston, Attorney at Law'; * * * accepted employment from one Frances Peecher to secure a divorce for her; prepared a complaint for her to sign; and procured another attorney to sign the complaint as attorney for plaintiff." *Id*. at 53.

The defendant had also effected a compromise with a client's creditors. The court concluded: "It may be doubted whether effecting a compromise with creditors constitutes practicing law. The other transaction, however, did constitute practicing law[.]" *Id*. at 54. Thus, although the "practice of law" *circa* 1937 clearly included appearing in court and drafting court

documents, it was unsettled whether that concept encompassed engaging in out-of-court negotiations on a "client's" behalf[10] or other nonlitigation-based advice and activity.

Some of that uncertainty was dispelled in *State Bar v. Security Escrows, Inc.*, 233 Or 80, 377 P2d 334 (1962). There, an escrow company appealed from a judgment enjoining it, pursuant to ORS 9.166, from drafting a range of documents, including contracts, deeds, mortgages, satisfactions, leases, and options. In reviewing the injunction, the court identified the essence of the "practice of law," as being the informed application of legal principles to address a particular person's individual circumstances and needs:

> "Turning * * * to the specific matter of documents vesting property rights, the *exercise of discretion* concerning property rights of another should be entrusted only to those learned in the law. There are, of course, matters in which persons who are not trained in the law can give perfectly sound business advice. However, when laymen select and prepare instruments creating rights in land for other members of the public there is always the danger that they may do the job badly. In the exceptional case the routine procedure may be grossly wrong. * * * We are justified in taking judicial notice of the fact that badly drawn instruments create not only needless litigation but needless loss and liability. A little of this mischief may flow from the carelessness of lawyers, but by far the most of it is the work product of laymen. In either case the injured party may have a cause of action for damages, but it is in the public interest to keep these difficulties to a minimum.

> "* * * * *

> "For the purposes of this case, we hold that the practice of law includes the drafting or selection of documents and the giving of advice in regard thereto any time an informed or trained discretion must be exercised in the selection or drafting of a document to meet the needs of the persons being served. *The knowledge of the customer's needs obviously cannot be had by one who has no knowledge of the relevant law. One must know what questions to ask. Accordingly, any exercise of an intelligent choice, or an informed*

---

[10] As noted above, the repealed statutory definition of the "practice of law" expressly included such activities.

*discretion in advising another of his legal rights and duties, will bring the activity within the practice of the profession."* *Id.* at 87, 89 (some emphasis supplied).

Applying that analysis, the court sustained the injunction to the extent that it restrained the defendants' selection and preparation of documents where that conduct required "an intelligent choice between alternative methods," 233 Or at 91, but concluded that the injunction was overbroad to the extent that it barred the defendants from acting as "mere scriveners" who did nothing more than fill in documents at their customers' direction. *Id.* at 91-92.

In *State Bar v. Miller & Co.*, 235 Or 341, 385 P2d 181 (1963), the court affirmed an injunction against a nonlawyer who, as part of his insurance business, provided advice on estate planning. The court held that, when a client receives advice from a nonlawyer and the advice "involves the application of legal principles[,] [t]his constitutes the practice of law." *Id.* at 344. The court further explained:

> "It must be conceded that frequently advice given in the course of carrying on a business is shaped by a knowledge of the applicable law. But the giving of such advice is not in every instance regarded as the practice of law. The legal ingredient in the advice may be so insubstantial as to call for the application of the principle of *de minimis non curat lex*. This is not to say that we adopt the view permitting the practice of law where the legal element is merely incidental to the business activity being carried on. To fall outside the proscription of the statute the legal element must not only be incidental, it must be insubstantial. It cannot be said that one who plans another person's estate employs the law only in an insubstantial way." *Id.* at 344-45 (footnote omitted).

■ The final, and most recent, pertinent "unauthorized practice" decision is *Oregon State Bar v. Gilchrist*, 272 Or 552, 538 P2d 913 (1975). There, the court held that the advertising and sale of generic, noncustomized do-it-yourself divorce kits did not, without more, constitute the practice of law:

> "We find persuasive the holding in *New York County Lawyers' Association v. Dacey*, 28 AD 2d 161, 283 NYS 2d 984, [*rev'd* 21 NY 2d 694 (1967)]. There it was held that the

publication, distribution and selling of Norman F. Dacey's book 'How to Avoid Probate' did not constitute the practice of law since the publication was directed to the general public and not to a specific individual. The dissenting opinion in the Appellate Division, which was adopted by the Court of Appeals, stated in pertinent part:

> " "* * * It cannot be claimed that the publication of a legal text which purports to say what the law is amounts to legal practice. And the mere fact that the principles or rules stated in the text may be accepted by a particular reader as a solution to his problem, does not affect this. * * *

> " 'Dacey's book is sold to the public at large. *There is no personal contact or relationship with a particular individual. Nor does there exist that relation of confidence and trust so necessary to the status of attorney and client. This is the essential of legal practice—the representation and the advising of a particular person in a particular situation.'*

> "* * * * *

> "We conclude that in the advertising and selling of their divorce kits the defendants are not engaged in the practice of law and may not be enjoined from engaging in that part of their business." 272 Or at 558-59, 563 (emphasis supplied).

Thus, the mere general dissemination of legal information by nonlawyers does not constitute the unauthorized practice of law. The court proceeded, however, to conclude that other, more personalized contact and advice was properly enjoined:

> "[A]ll personal contact between defendants and their customers in the nature of consultation, explanation, recommendation or advice or other assistance in selecting particular forms, in filling out any part of the forms, or suggesting or advising how the forms should be used in solving the particular customer's marital problems does constitute the practice of law and must be and is strictly enjoined." *Id.* at 563-64.

There have been no notable post-*Gilchrist* decisions amplifying or refining the meaning of "practice of law."[11]

---

[11] In *Oregon State Bar v. Wright*, 280 Or 693, 573 P2d 283 (1977), the court generally affirmed an injunction restraining the nonlawyer defendant from providing

■ We cannot, and will not, purport to derive an omnibus definition of "practice of law" from *Johnston, Security Escrows, Miller*, and *Gilchrist*. Indeed, *Security Escrows* cautions that a determination of unauthorized practice may depend on case-specific circumstances. 233 Or at 85-89. Nevertheless, regardless of any uncertainty at the margins, certain core criteria are well settled. Most significantly, for present purposes, the "practice of law" means the exercise of professional judgment in applying legal principles to address another person's individualized needs through analysis, advice, or other assistance.

We return, then, to defendants' arguments that ORS 9.160 violates Article I, section 8. In *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994), the court summarized the controlling analysis, enunciated in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), and *State v. Plowman*, 314 Or 157, 838 P2d 558 (1992), *cert den* 508 US 974 (1993), which delineates three types of statutes implicating expression:

> "The first *Robertson* category consists of laws that 'focus on the *content* of speech or writing' or are ' "written in terms directed to the substance of any 'opinion' or any 'subject' of communication." ' Laws within that category violate Article I, section 8, 'unless the scope of the restraint is wholly confined within some exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859

in-court representation and litigation-related services that fell within the narrowest historically recognized concept of "practice of law." *See* 149 Or App at 177-79. In so holding, the court rejected the defendant's argument that ORS 9.160 was unconstitutionally vague (the defendant did not raise any free exercise challenge under Article I, section 8) and reiterated the statute's consumer-protective purpose:

> "[T]here is no 'right,' as a matter of 'free enterprise,' to engage in many professions and occupations because of the provisions of statutes which provide that only persons who are properly qualified, accredited and licensed by a board or commission established by statute may engage in those professions and occupations. These include doctors, dentists, architects, engineers, accountants, real estate brokers, land surveyors, funeral establishments, auctioneers, barbers, plumbers, and many other professions and occupations.
>
> "* * * * *
>
> "The reason for the statutes relating to all of these professions and occupations is to protect the public from the consequences resulting from attempts to engage in such professions and occupations by persons who are not properly trained and qualified to do so." *Id.* at 697-98 (footnote omitted).

demonstrably were not intended to reach.' The second *Robertson* category consists of laws that 'focus[ ] on forbidden effects, but expressly prohibit[ ] expression used to achieve those effects.' Laws in that category 'are analyzed for overbreadth.' Finally, the third *Robertson* category consists of laws that 'focus[ ] on forbidden effects, but without referring to expression at all.' Laws within the third category are analyzed to determine whether they violate Article I, section 8, as applied." *City of Eugene*, 318 Or at 488 (citations omitted; emphasis in original).

*See also Fidanque v. Oregon Govt. Standards and Practices*, 141 Or App 495, 500-01, 920 P2d 154, *rev allowed* 324 Or 487 (1996) (summarizing methodology).

That analysis, as framed and applied by the Supreme Court and our court, assumes that *all* statutes *must* fall into one of the three enumerated categories, no matter how awkward the fit. The *Robertson/Plowman* taxonomy seems somewhat ill-suited in assessing the constitutionality of a general professional licensing and regulatory scheme, in that virtually every profession—*e.g.*, medicine, psychiatry, teaching, accounting—involves some element of expression, albeit in the context of the broader rendition of professional services. The same could be said of such licensed vocations as securities, insurance, or real estate brokerage. Nevertheless, the *Robertson/Plowman* methodology purports to describe the applicable universe, and we proceed to apply it.

■    Defendants first argue that ORS 9.160 is facially unconstitutional, as falling within the first *Robertson/Plowman* category, because it burdens a type of expression, *viz.*, "out-of-court legal speech," that did not fall within any historical exception recognized at the time of statehood. Whatever the merits of defendants' arguments about the historical status of nonlitigation-related speech, their argument fails in its first premise: ORS 9.160 is not "written in terms directed to the substance of any 'opinion' or any 'subject' of communication." *Robertson*, 293 Or at 412.

As noted in *Gilchrist*, ORS 9.160 does not proscribe the mere generalized exchange of legal information or discussion of legal issues. 272 Or at 558-59, 563. Rather, the statute is expressly directed to limiting the conduct of a profession—

the practice of law—to those who possess certain qualifications. It cannot be gainsaid that some part of the practice of law involves expression—and, indeed, that expression is an indispensable component of some aspects of legal practice. However, as described above, the practice of law involves conduct, processes, and relationships that transcend mere expression. In that respect, ORS 9.160 and the corollary legal licensing statutes are no different from other professional licensing and regulatory schemes. Defendants' analysis, if extended in principle, would compel the invalidation of many, and perhaps all, of those analogous statutes. *See, e.g.*, ORS 677.080; ORS 677.085 (prohibiting unauthorized practice of medicine); ORS 675.020 (prohibiting unauthorized practice of psychology); ORS 673.615 (prohibiting unauthorized practice of tax consulting). ORS 9.160 does not fall within the first *Robertson/Plowman* category.

The closer question is whether the statute is more properly consigned to the second *Robertson/Plowman* category, or to the third. *See, e.g., State v. Chakerian*, 135 Or App 368, 373-75, 900 P2d 511, *aff'd* 325 Or 370, 938 P2d 756 (1997).

An initial difficulty with assigning the statute to either category is that both assume that the statute, either by its terms or by reference to context, "focuses on" some discrete "forbidden effect." *Plowman*, 314 Or at 164. *See State v. Stoneman*, 323 Or 536, 546, 920 P2d 535 (1996) ("An examination of the *context* of a statute, as well as its wording, is necessary to an understanding of the policy that the legislative choice embodies." (Emphasis in original.)). The problem, however, is that, just as ORS 9.160 does not, by its terms, refer to "the substance of any 'opinion' or any 'subject' of communication," *Robertson*, 293 Or at 412, the statute also does not expressly refer to any targeted harmful effect of the unauthorized practice of law. Nor is the targeted harm obvious from statutory context, including particularly other laws pertaining to licensing and regulation of attorneys. *See, e.g.*, ORS 9.241 (regulating appearances in court by attorneys licensed in other jurisdictions); ORS 9.280 (regulating immigration consulting to members of Oregon State Bar); ORS 9.500 (prohibiting some forms of solicitation by attorneys).

To be sure, ORS 9.160 and other related statutes could reasonably be, and have been, viewed as consumer-protective measures. *See, e.g., Security Escrows; Miller.* Conversely, those statutes could be read, just as plausibly and less benignly, as perpetuating a professional "monopoly." Our point is not to give credence to the latter reading, and certainly not to take issue with the former. Our concern, rather, is that neither an examination of the unadorned "*context* of the statute [nor] of its wording*" yields a clear "understanding of the policy that the legislative choice embodied." *Stoneman,* 323 Or at 536.[12] It is tempting in such circumstances to carve out a fourth category, beyond the *Robertson / Plowman* three, consisting of statutes that neither expressly prohibit expression nor are directed against some textually or contextually verifiable evil, but whose application may, nevertheless, collaterally burden expression. Unfortunately, the prevailing methodology seems to foreclose that possibility.

So constrained, we consign ORS 9.160 to the third *Robertson/Plowman* category. To fall within the second, a statute must "expressly prohibit expression." *Plowman,* 314 Or at 164. *See Stoneman,* 323 Or at 543 ("If such a statute expressly prohibits certain forms of expression, it must survive an overbreadth challenge[.]"). In *Chakerian,* we considered the content of that requirement:

"[W]hat does it mean that a statute 'expressly prohibits expression'?

"We perceive in *Robertson's* progeny two classes of statutes that fall within the second *Robertson* category. The first includes statutes that explicitly identify communicative conduct as a proscribed means of achieving a forbidden effect. * * *

"The second class of statutes is less obvious. It includes statues that, although they do not explicitly refer to communicative conduct, can be violated *only* by means of

---

[12] It is unclear what role, if any, general judicial discussions of a statute's purposes, *e.g., Security Escrows; Wright,* play in *Stoneman's* contextual inquiry, which, at least in *Stoneman,* referred exclusively to the text and structure of related statutes.

expression. In other words, regardless of the statute's particular language, a person cannot violate the statute without engaging in communicative conduct. That class acknowledges the dictates of substance over form. Regardless of the precision—or, perhaps the studied imprecision—of statutory language, when expression is the only possible means of violating the statute, the statute, necessarily, expressly proscribes expression." 135 Or App at 375 (emphasis in original; footnote omitted).

Here, as noted, ORS 9.160 does not "explicitly identify communicative conduct as a proscribed means of achieving a forbidden effect." 135 Or App at 375. The statute does not explicitly refer to expression at all.

Nor can ORS 9.160 be "violated *only* by means of expression." *Chakerian*, 135 Or App at 375 (emphasis in original). Our conclusion in that regard flows from the essence of the "practice of law"—and, thus, of the unauthorized practice of law—described above. That essential element is the rendition of legal services that required the exercise of informed discretion in applying legal principles to address a particular "client's" individual needs. 149 Or App at 183. Some of those services are intrinsically communicative or expressive—*e.g.*, advice, negotiation, or drafting. But others, for which attorneys routinely bill their clients, are not—including, most significantly, research and analysis. Indeed, even advice, negotiation, and drafting, are only the final, articulated products of the skills and processes that form the core of the lawyer's craft, the exercise of professional judgment. In a related sense, the consumer-protective policies that underlie ORS 9.160 may be offended not merely by what is expressed, but also by what is not—by advice not given and by actions not taken. Because ORS 9.160 can be violated by means other than expression, it falls, albeit somewhat unsatisfactorily, into the third *Robertson/Plowman* category.

■    Statutes in the third category "are analyzed to determine whether they violate Article I, section 8, as applied." *Miller*, 318 Or at 488. Such statutes "are subject to challenge * * * on vagueness grounds or on the ground that the statute's reach, as applied to defendant, extends to privileged expression." *Stoneman*, 323 Or at 543. In *Oregon State Bar v.*

*Wright,* 280 Or 693, 700-01, 573 P2d 283 (1977), the court concluded that ORS 9.160 was not unconstitutionally vague for purposes of the Fourteenth Amendment to the United States Constitution, and plaintiff here advances no persuasive reason for reaching a different conclusion under Article I, section 8. Nor was the statute's application to defendant's activities impermissibly overbroad. The injunction, issued pursuant to ORS 9.160 and ORS 9.166, carefully limits the breadth of its prohibition to conduct, including communication, that pertains to representing and counseling persons with regard to their particular legal matters. Such a prohibition does not impermissibly burden protected expression for purposes of Article I, section 8.

Defendants' second assignment of error asserts, primarily, that the injunction itself is overbroad under the First and Fourteenth Amendments to the United States Constitution. Defendants argue:

> "The trial court's injunction banned Ms. Smith from all law practice including all forms of federal and state sanctioned nonlawyer law practice. In doing so, the trial court's injunction order violates Ms. Smith's rights to free speech and association guaranteed by the First and Fourteenth Amendments * * *, as well as by the Oregon Constitution.
>
> "* * * * *
>
> "In short, while certain areas of law practice are proscribed, large areas of nonlawyer law practice are state and federally sanctioned. Yet the trial court's injunction prospectively bans Ms. Smith and her company from all forms of law practice, whether authorized or not. State and federally sanctioned legal advice is educational speech and cannot be banned absent a compelling state interest and means narrowly tailored to further the state's interest while protecting the speakers right to speak freely."

■       That argument fails. As we have explained, the injunction does not ban speech *qua* speech; it restrains speech in the context of a putatively professional relationship. As significantly, defendants have not demonstrated that they *actually engage* in practices within the supposed areas of overbreadth.[13] Finally, and in all events, defendants'

---

[13] We note particularly that plaintiffs' "applied" arguments, as briefed, do not challenge the validity of paragraph 7 of the injunction, *see* 149 Or App at 174-75 as

argument assumes, without apt authority or analysis, that the First Amendment somehow generally preempts state law-based restraints on unauthorized legal practice of law. The only authority defendants invoke, *United Transportation Union v. State Bar of Michigan*, 401 US 576, 91 S Ct 1076, 28 L Ed 2d 339 (1971), and *Railroad Trainmen v. Virginia Bar*, 377 US 1, 84 S Ct 1113, 12 L Ed 2d 89 (1964), involved injunctions actually burdening the continuing exercise of rights of labor organization and representation. Here, defendants have not shown any such impairment.[14]

We reject defendants' remaining arguments without further discussion.

Affirmed.

---

applied to their practices and operations. *Compare, e.g., Security Escrows*, 233 Or at 91-93.

[14] We have found no cases expressing a general federal disapproval of state law-based restrictions on the unauthorized practice of law. *See*, for example, *Thomas v. Collins*, 323 US 516, 544-45, 65 S Ct 315, 89 L Ed 430 (1945) (Jackson, J., concurring):

"A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views. Likewise, the state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought. * * *

"This wider range of power over pursuit of a calling than over speech-making is due to the different effects which the two have on interests which the state is empowered to protect. The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system."