Argued and submitted September 9, 1998; resubmitted en banc September 20, affirmed October 25, 2000

In the Matter of Denial of the
Application for the Custom Plates
"WINE" "INVINO" "VINO" of

Michael Paul HIGGINS,
*Petitioner,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES BRANCH (DMV),
*Respondent.*

(60486; CA A96871)

13 P3d 531

Edmund J. Spinney argued the cause for petitioner. With him on the briefs was the American Civil Liberties Foundation of Oregon, Inc.

David Schuman, Deputy Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Wollheim and Brewer, Judges.

ARMSTRONG, J.

Edmonds, J., concurring.

Wollheim, J., concurring.

Landau, J., dissenting.

**ARMSTRONG, J.**

Petitioner seeks judicial review of a final order of the Driver and Motor Vehicle Services Branch (DMV) that denied him his requested choices for custom license plates for his state-registered passenger vehicles. He argues that the DMV rules that bar his requested messages on his custom license plates violate Article I, section 8, of the Oregon Constitution and the First Amendment to the United States Constitution. We affirm.

Most Oregon motor vehicles must be registered with the state and must have state-created license plates affixed to them when they are driven on public highways. *See* ORS 803.300, ORS 803.305(4), ORS 803.520-.535, ORS 803.540.[1] The license plates serve to identify the vehicles as registered vehicles. They also serve to distinguish each registered vehicle from every other registered vehicle, because the license plate for each vehicle has a different combination of characters from that of every other registered vehicle. *See* ORS 803.535(1)(b), (d).

The state established its custom license plate system for motor vehicles in 1971.[2] Before then, the state provided no formal mechanism by which people registering vehicles could play a role in selecting the characters that appeared on the license plates for their vehicles. The state simply assigned them license plates with character combinations that it selected.

The custom plate system gives vehicle owners the opportunity to propose to DMV the combination of characters that DMV will use on license plates to identify their vehicles as registered vehicles. DMV has adopted rules to implement that system. Those rules establish the criteria by which DMV will approve a proposed combination of characters for a custom plate for a registered vehicle. Those criteria focus, in

---

[1] Not all Oregon motor vehicles must be registered in order to be driven on public highways. For example, farm tractors are exempt from the registration requirement. ORS 803.305(1).

[2] *See* Or Laws 1971, ch 211.

turn, on the content of the message that proposed combinations could communicate to people viewing them. *See* OAR 735-46-010(7) (1995).[3]

The combinations that petitioner proposed for his custom license plates were variations of words associated with wine. DMV concluded, and petitioner does not dispute, that his proposed combinations conflict with a provision in the DMV rules that bars approval of drug-related words, which include words that "refer to any intoxicating liquor." OAR 735-46-000(8) (1995).[4] Petitioner contends, however, that the rules that impose that prohibition violate Article I, section 8, and the First Amendment because they impose an impermissible content-based restriction on his speech.

---

[3] The rules at issue are those that were in effect when petitioner applied for his custom plates. At that time, OAR 735-46-010(7) (1995) provided that

"DMV shall deny custom plate choices that are:

"(a) Words of a vulgar nature;

"(b) Sex-related words;

"(c) Excretory-related words;

"(d) Words related to intimate body parts;

"(e) Drug-related words; or

"(f) Ethnic words."

[4] The following definitions apply to the restrictions imposed by OAR 735-46-010(7) (1995):

"(4) 'Words of a Vulgar Nature' shall be those words labeled as 'vulgar' or 'vulgar slang' in the current edition of the New College Edition, American Heritage Dictionary.

"(5) 'Sex-Related Words' shall be those words which by denotation or connotation refer to the sex organs, to activities involving the sex organs (for example sexual intercourse), or to a purveyor of sex.

"(6) 'Excretory-Related Words' shall be those words which by denotation or connotation refer to the external elimination of urine, feces or related matter.

"(7) 'Words related to intimate body parts' shall be those words which by denotation or connotation refer to the breasts, genitalia, pubic area or the buttocks.

"(8) 'Drug-Related Words' shall be those words which by denotation or connotation refer to any intoxicating liquor or controlled substance or their use.

"(9) 'Ethnic Words' shall be those words which by denotation or connotation refer to a definable class of persons (such as on the basis of sex, sexual preference, race, nationality, creed, religious preference or place of historical origin) and that ridicule or support superiority of that class."

OAR 735-46-000(4)-(9) (1995).

■    Article I, section 8, provides that

> "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The provision limits the power of the state to control what *others* communicate. Except in circumstances not presented here, the provision does not impose a limit on the power of the state to determine what *it* communicates.[5] The problem presented by this case is that the communication at issue is a communication by both petitioner *and* the state. The resolution of that problem ultimately turns on how the communication is to be viewed: as petitioner's, as the state's, or as both.

In petitioner's view, the fact that he wishes to use the custom plate system to communicate means that any restriction imposed by the state on his ability to do that must be analyzed in the same way that other state-imposed restrictions on speech are analyzed. Under that approach, the restrictions would be evaluated under the familiar analytical model established by *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), to determine whether they violate Article I, section 8. Petitioner's proposed approach necessarily ignores the fact that the state uses license plates to communicate state information for a state purpose, because the proposed approach does not modify the *Robertson* analysis in any way to reflect that fact. In other words, petitioner views the communication that occurs through the use of custom plates as that of the people who purchase them, and analyzes the state restrictions imposed on that communication accordingly.

---

[5] Leaving aside the issue of access to governmental information, state decisions about what it will communicate generally do not restrain or restrict what others communicate, so state decisions about its communication generally do not implicate Article I, section 8. There may be circumstances, however, in which a state decision about its communication could restrict communication by others. For example, the United States Supreme Court held in *Wooley v. Maynard*, 430 US 705, 713-17, 97 S Ct 1428, 51 L Ed 2d 752 (1977), that a person had a right under the First Amendment not to be required over his objection to communicate a state motto on the license plate for his car. The same principle might apply under Article I, section 8, because state compulsion to communicate an opinion restricts the compelled person's freedom to choose the opinions to communicate.

Conversely, if the communication is viewed as the state's, then the decision embodied in the state rules on what the state will communicate on license plates is not subject to the *Robertson* analysis, because Article I, section 8, generally does not restrict the state's choices about what it will communicate.[6] Of course, that approach ignores the fact that the people who purchase custom plates do so to communicate as well, because the approach does not reflect that fact in any way.

Treating the communication on custom plates as that of both the state and the plate holders does not resolve the problem, because there is no way to blend the competing perspectives on the nature of the communication. State choices about what it communicates on state license plates cannot both be subject to Article I, section 8, and not subject to it. Consequently, if the communication is considered in any respect to be that of the plate holders, it makes Article I, section 8, applicable to the state's choice about what it communicates, and essentially denies the communication its status as a state communication, because state decisions about its communication generally do not implicate Article I, section 8.[7]

■ We believe that the proper course is to view the communication that occurs on state license plates, including custom plates, as state communication rather than as communication by the plate holders or a combination of both. Although the custom plate statutes and implementing rules give people the opportunity to suggest to the state what, if any, message *it* will convey on the license plates for their vehicles, the opportunity to propose a message does not change the fact that the plates constitute a state communication for a state purpose, and, under the circumstances of

---

[6] *But see* 170 Or App at 546 n 5.

[7] Of course, the state still could exercise control over individual choices about the content of custom plates to the extent necessary to achieve the state's communicative objectives. For example, the state could deny everyone other than petitioner the right to put the word "WINE" on a license plate in order to preserve the use of license plates as a means of reliably distinguishing among vehicles. As we explain below, 170 Or App at 549, an approach that subjects state choices about what it communicates to an evaluation of whether the particular choices are necessary to achieve the state's communicative objectives presents an insurmountable analytical problem under Article I, section 8.

this case, the state gets to decide what it will communicate in doing that.[8]

The state's role in that process is not different, in principle, from its role in choosing the symbols that it uses for the background for state license plates. The state established a contest in 1987 by which people could propose a new design for the state license plate, based on criteria chosen by the state. *See* Or Laws 1987, ch 572. The current plate design featuring mountains and coniferous trees is the product of that contest.[9] The contest gave people the opportunity to propose symbols that the state would use to communicate through its license plates, but the decision about the symbols was the state's to make.

Similarly, there are several plate designs that the state has made available to people to choose for their vehicles, including the plate with mountains and trees, a plate featuring a salmon and a plate featuring a Conestoga wagon. *See, e.g.*, ORS 805.205, ORS 803.210, ORS 803.255. Giving people a choice of designs allows them to choose the message that they wish to convey from among the available choices, but, again, it is the state that gets to choose the designs that it will use for its plates.

The range of character combinations that the state has made available to be used to identify registered vehicles under its custom plate rules is much broader than the range of plate designs that it has made available for that purpose,

---

[8] The dissent appears to agree that our resolution of the questions presented by this case makes sense, but it concludes that *Robertson* requires a different result. *Robertson* and its progeny do not require that. No Oregon case of which we are aware has involved the application of the *Robertson* analysis to state speech. Every case has involved state restrictions imposed on communication by others without any state participation in the communication. *See, e.g., State v. Stoneman*, 323 Or 536, 920 P2d 535 (1996); *Moser v. Frohnmayer*, 315 Or 372, 845 P2d 1284 (1993); *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988); *State v. Moyle*, 299 Or 691, 705 P2d 740 (1985); *Robertson.* This case requires us to consider, for the first time, how to analyze state restrictions on the ability of others to affect what the *state* communicates in performing *its* functions. Contrary to the dissent's suggestion, no Oregon case, including *Robertson*, tells us how to do that, so we necessarily have had to analyze the issue in a way that we believe to be faithful to Article I, section 8, and the Oregon cases that have interpreted it. We have done that.

[9] To be precise, the 1989 Legislature modified the approved design by changing the color of the sky in it. *See* Or Laws 1989, ch 742, § 4 (codified at ORS 803.538).

but that does not alter the fact that the plates constitute a state communication for a state purpose, and the state gets to choose what *it* communicates for that purpose. Although its decision to restrict the combination of characters that it will use on license plates to identify registered vehicles restricts the ability of people to communicate freely through their choice of characters for their license plates, that restriction does not violate Article I, section 8.

■■ A contrary conclusion would present a fundamental analytical problem under Article I, section 8. Except for laws that come within a recognized historical exception to the protection afforded free expression by Article I, section 8, laws restricting expression are required to focus on the effects of the expression, because Article I, section 8, bars the state from choosing to restrict expression based on its content rather than its effects. But state decisions about what *it* will communicate necessarily are content-based decisions. Article I, section 8, supplies no means by which to reconcile the competing interests of the state to determine the content of *its* communication and of the people to be free from state restrictions on the content of *their* communication. The interests cannot be balanced against each other, because Article I, section 8, provides no principled standard by which to determine how the balance is to be struck between them. For example, restrictions imposed as part of a state choice about what it communicates cannot be evaluated to determine whether the restrictions are necessary to achieve the state's communicative objectives, because the objectives, themselves, are subject to state choice, and there is no constitutional standard by which to measure the necessity of choosing the particular objectives. Moreover, an essential feature of Oregon's free speech analysis is the principle that Article I, section 8, bars the state from balancing the people's right of free expression against the state's competing policy objectives, *see, e.g.*, *State v. Stoneman*, 323 Or 536, 542-43, 920 P2d 535 (1996), but any attempt to reconcile the competing interests of the people and the state with regard to state communication would lead to precisely that kind of balancing. Consequently, we believe that the correct course requires us to treat the communication that occurs on custom license plates as state communication, and to analyze state decisions about that communication accordingly.

That approach fits with one of the principles that underlies the concept of a public forum. Assuming, for these purposes, that Oregon's free speech analysis encompasses the concept of a public forum, the use of state vehicle licenses to communicate a state message is what would distinguish the licensing system from such a forum. A public forum for these purposes is one in which people have an historically recognized right to use state property to communicate without the state exercising control over the content of the communication or one in which the state has made its property available for that purpose.[10] Those who speak in those forums speak for themselves and *not* for the state. Because the speech that occurs there is that of the speakers and not the state, Article I, section 8, presumably would apply to state restrictions on that speech in the same way that it applies to state restrictions on speech in private forums.[11] Where, however, the speech that occurs in a forum is the state's speech, the state's decision to allow people to make recommendations about that speech would not convert the forum to a public one.

That principle may maintain symmetry between the state's and the people's ability to compel the other to speak. If the speech that occurs in a forum is state speech, but the constitution treats the forum as a public forum, then people would generally be free to make the state say whatever they chose, because Article I, section 8, would constrain the state's authority to restrict what was said in the forum. If, instead, such a forum is not a public forum, then people cannot use the forum to compel the state to speak. Similarly, the free speech rights that people enjoy may prevent the state from requiring them to say things that they do not want to say. *See Wooley v. Maynard*, 430 US 705, 713-17, 97 S Ct 1428, 51 L Ed 2d 752 (1977) (under First Amendment, state could not require license plate holder to communicate message "Live Free or Die" over plate holder's objection to the message).[12]

---

[10] *Cf., e.g., Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 US 37, 44-46, 103 S Ct 948, 74 L Ed 2d 794 (1983) (notes the existence of both types of forums under the First Amendment).

[11] *Cf., e.g., City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994) (restriction on sale of expressive material on city sidewalks analyzed under *Robertson*).

[12] Judge Wollheim's concurrence takes a different tack. It contends that all state restrictions on speech must be analyzed under the *Robertson* analysis, but

The following hypothetical illustrates the principle: Assume that the state solicits the submission of communicative material to be placed in display cases at the State Capitol, with detailed standards for the content of the submissions and a commission to screen the submissions for compliance with the standards. The selection of the topics and standards for the material would deny people the right to display whatever they might choose to display, but the restrictions on the freedom of people to communicate in that

concludes that the DMV rules come within an incompatibility exception to that analysis. We see several problems with that approach. First, we and the concurrence agree that the existing analytical framework does not directly address the issue presented by this case. Consequently, it is necessary to adapt that analysis. The concurrence does that by modifying the incompatibility exception and then using the modified exception to support its conclusion that the state's choices about its communication on petitioner's license plates prevail over petitioner's choices. We believe that it is simpler, and correct, to recognize that it is the nature of the communication, itself, that determines why the state's choices prevail over petitioner's. Hence, we see no reason to adapt the incompatibility exception for use in this case.

Second, we do not believe that the concurrence's modification of the exception is faithful to it. As the concurrence recognizes, the exception has been uniformly applied to uphold restrictions on communication by *public* officials that is incompatible with their official functions. It is a significant, and we believe unwarranted, extension of the exception to use it to uphold a restriction on communication by *private* individuals whose speech is said to be incompatible with a governmental function.

Finally, we do not believe that the DMV rules can be understood to restrict expression that is incompatible with DMV's functions. The concurrence equates the use of words that identify drugs or intoxicating liquor on license plates with the message that it is acceptable to ingest them and drive. If the words, alone, conveyed that message, their use on license plates would perhaps be incompatible with the effort by DMV and related state agencies to prevent people from driving while under the influence of intoxicants. But the words, standing alone, do not convey that message. The words WINE, INVINO, and VINO that petitioner sought for his license plates cannot be understood to communicate the idea that people should drink and drive, so their presence on license plates cannot be understood to be incompatible with any function performed by DMV. (If the words were incompatible, it would be difficult to explain why state-approved signs to identify the location of Oregon wineries have been installed on the rights-of-way of Oregon highways so that people driving on the highways will visit the wineries. *See* OAR 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 to OAR 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 (rules governing approval of tourist-oriented directional signs on state highways).) Furthermore, the DMV rules prohibit the use of the word "wine" on a license plate, which presumably means that the license plate NO WINE would violate the rule. While the statement NO WINE would be incompatible with the efforts of the Oregon Wine Advisory Board to promote the Oregon wine industry, *see* ORS 576.755, it is difficult to see how that message would be incompatible with DMV's functions, yet the rules prohibit it. Contrary to the concurrence's view, the incompatibility exception cannot be used to uphold DMV's rules if, as the concurrence contends, they otherwise are invalid under *Robertson*.

forum would not be scrutinized under Article I, section 8, to determine whether the restrictions came within a recognized historical exception to the protection afforded free expression or whether they were written in terms of the harmful effects of the expression. *Cf., e.g., Robertson*, 293 Or at 412-18 (describes analysis used under Article I, section 8, to determine the validity of state-imposed restrictions on speech by others). The communication in the display cases at the Capitol would be analyzed under Article I, section 8, as state communication, even though people would be given the opportunity to communicate through the material submitted by them for the display cases.

The same analysis would apply to a state-published magazine or newsletter that solicited or accepted manuscripts for publication. Moreover, the analysis would apply whether the state wants to communicate a message or only to avoid communicating one. Under each circumstance, a determinative issue would be whether the communication is state communication. If it is, restrictions imposed by the state on the ability of people to communicate by affecting the content of the state communication would be analyzed differently under Article I, section 8, from other state-imposed restrictions on expression.[13]

■■■ The DMV rules also do not violate the First Amendment.[14] In *Arkansas Ed. Television Comm'n v. Forbes*, 523 US 666, 118 S Ct 1633, 140 L Ed 2d 875 (1998), the Supreme

---

[13] To forestall any misunderstanding, we emphasize that our decision addresses only the narrow situation presented in this case in which private individuals or entities are given the opportunity to recommend to the state what *it* will communicate or to select among messages chosen by the state for *its* communication. Our resolution of that issue does not necessarily control the result in all situations in which the state and others are jointly involved in communication.

[11] The First Amendment to the United States Constitution provides that

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The First Amendment is applicable to the states through the Fourteenth Amendment. *E.g., City of Ladue v. Gilleo*, 512 US 43, 45 n 1, 114 S Ct 2038, 129 L Ed 2d 36 (1994).

Court highlighted the differences between public and non-public forums by examining how each is created. The Court wrote:

> "On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers * * *. On the other hand, the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers whose members must then, as individuals, 'obtain permission' to use it."

*Id.* at 679 (citation omitted). Here, the state has reserved eligibility for license plate registration to those who meet its statutory qualifications.[15] Those who qualify must then "obtain permission" from DMV in order to obtain the custom license plate of their choice, which appears to make the custom plate system a nonpublic forum under the First Amendment. The state does not violate the First Amendment by controlling the content of communication in a nonpublic forum if the restrictions imposed on content are reasonable in light of the purposes of the forum and are viewpoint neutral. *See, e.g., id.* at 682. Petitioner does not dispute that the DMV rules meet that standard, and we conclude that they do.

■       Petitioner argues, however, that DMV's function in approving plates is "ministerial" in nature—decision making without an official exercise of discretion—and therefore incapable of creating a nonpublic forum.[16] In deciding whether a license plate message falls within the expression prohibited by DMV's rules, DMV is directed to consider the message "to be the most objectionable denotation or connotation that reasonably may be ascribed to it." OAR 735-46-010(8) (1995). Even within those guidelines, our language is complex enough to require the exercise of judgment when deciding the reasonable meaning of many messages. The word "scatt," for example, means tax or tribute. *Webster's Third New International Dictionary*, 2027 (unabridged ed 1993). Is it reasonable

---

[15] Those qualifications are enumerated in ORS 803.350 to ORS 803.360.

[16] Petitioner's argument assumes that the permission to be granted must involve an exercise of discretion in order for the forum that is subject to that permission to be a nonpublic forum. We do not decide whether that assumption is correct in resolving whether the custom plate system constitutes a nonpublic forum.

to accord that term the same meaning as "scat," a sudden rain shower; "scat," to scatter, smash, or beat; "scat," to go away quickly; "scat," to improvise meaningless syllables in a melody; or, finally, the "scat" that is animal feces?[17] Whatever the outcome, we see nothing ministerial in resolving that question. Regardless of whether the "reasonable" decision is easy or hard to make, it still requires an element of judgment that places the process beyond a purely ministerial function. Because state license plates are not a public forum, the DMV rules that petitioner challenges do not violate the First Amendment.

Affirmed.

**EDMONDS, J.,** concurring.

I agree with the lead opinion's result, but not with all of the statements in its opinion. The lead opinion concludes that the information that is displayed on state license plates on vehicles that are being driven on state highways is communication by the state rather than communication by motorists, or is a combination of communication by the state and the motorists. In my view, the breadth of that conclusion ignores the reality of the underlying facts.

There are three stages of expression involved when a motorist makes an application for a personalized license plate. First, the applicant requests that DMV adopt the applicant's proposed language on the license plate that will be issued to the applicant. That expression is only the applicant's. Second, DMV issues the license plate and delivers it to the applicant. Whether the license contains the proposed language of the applicant or not, it is only the expression of the agency until the expression is adopted by the applicant by the placement of the plate on the vehicle. Third, by placing the license on his vehicle, the applicant makes it part of his own expression. At the third stage, there is truly a combined expression by the state and the applicant.

The restraint on expression arising out of the application of the rule occurs when DMV refuses, pursuant to the

---

[17] *See* OAR 735-46-010(7) (1995) (bars approval of excretory-related words on custom license plates); OAR 735-46-000(6) (1995) (defines excretory-related words to include words that refer to the external elimination of feces).

rule, to adopt the expression of the motorist contained in the application for the personalized license plate. At that point, the state is only concerned with a restraint on its own expression: whether it will adopt the applicant's proposed expression as its own. The state is free to prescribe the content of its own communications on license plates. Once the license is issued, then the motorist must decide whether to adopt it as his own expression. If the state has issued the plate with the proposed language, then the motorist is free to use the state's expression and combine it with his. If the state has not accepted his proposal, the motorist is at liberty to adopt the state's communication of numerals and letters as his own in exchange for the privilege of driving on the public highways of the state, or he may eschew the privilege, believing that the state's restriction on its own communication is offensive. In either instance, his right to express his message is not infringed. He may still display his expression on his vehicle. The only impediment arising from the rule is that he may not compel the state to combine his expression with its expression on the license plate. Thus, a motorist's freedom of expression would be violated only if the constitutions vested motorists with the unfettered right to have official state of Oregon license plates express content of their own choosing. Of course, such rights do not exist under any statute or the constitutions.

Brewer, J., joins in this concurrence.

**WOLLHEIM, J.,** concurring.

I concur with the lead opinion's decision, but not with its analysis. The problem with its analysis is that it refuses to apply the methodology announced in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982). Because the *Robertson* methodology applies to any statute or regulation, this court cannot simply ignore *Robertson* because it is convenient to do so. However, I would hold that the challenged regulations do not violate petitioner's rights under Article I, section 8, of the Oregon Constitution, and, thus, I concur.[1]

Article I, section 8, prohibits any law "restricting the right to speak, write or print freely on any subject whatever."

---

[1] I also concur with the lead opinion's First Amendment analysis.

That provision means what it says. Restrictions aimed at the content of speech itself are normally impermissible. *Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 783 P2d 7 (1989), *cert den* 498 US 810 (1990). "The nature of the prohibition, either civil or criminal, is immaterial to the first sentence of Article I, section 8, which directs that 'no law' shall restrict or restrain speech, writing and printing." *City of Hillsboro v. Purcell*, 306 Or 547, 553, 761 P2d 510 (1988).

There is no dispute that the rules in question facially concern expression and thus implicate Article I, section 8. In *Robertson*, the Supreme Court established a framework for evaluating whether a law violates Article I, section 8. Its analysis distilled Oregon laws implicating expression into three types:

> "The first *Robertson* category consists of laws that focus on the *content* of speech or writing or are written in terms directed to the substance of any opinion or any subject of communication. Laws within that category violate Article I, section 8, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach. The second *Robertson* category consists of laws that focus on forbidden effects, but expressly prohibit expression used to achieve those effects. Laws in that category are analyzed for overbreadth. Finally, the third *Robertson* category consists of laws that focus on forbidden effects, but without referring to expression at all. Laws within the third category are analyzed to determine whether they violate Article I, section 8, as applied." *City of Eugene v. Miller,* 318 Or 480, 488, 871 P2d 454 (1994) (internal quotes and brackets omitted; citations omitted; emphasis in original).

The *Robertson* framework assumes that all statutes regulating speech fall into one of only three possible categories. This court has previously noted that some applications may appear awkward in certain cases, particularly where licensing or regulatory schemes are involved. *Oregon State Bar v. Smith,* 149 Or App 171, 942 P2d 793 (1997). Nevertheless, I acknowledge that the *Robertson* methodology "purports to describe the applicable universe." *Id.* at 184. Here we must ascertain in what analytical category DMV's custom license

plate rules belong and how they are impacted by this state's jurisprudence of free expression.

*Robertson*'s second category is not implicated because neither the text nor context of the rules reveals a focus on proscribable harms regulated through incidental, albeit express, restraints on expression.[2] And because OAR 735-046-0010(7) (1995) proscribed the use of specific words, the rule does not fit into the third *Robertson* category. The only possible conclusion is that the rules before us proscribe "words" without reference, implied or otherwise, to specific harmful effects. Thus, the DMV rules focus on the content of the written communication. *Robertson*, 293 Or at 412. The Supreme Court has repeatedly held that, while certain harmful *effects* of speech may be forbidden, restrictions aimed at the content of speech and not its resulting harm are normally impermissible. *In re Fadeley*, 310 Or 548, 559, 802 P2d 31 (1990). At the same time, however, the court has stated that the sweep of Article I, section 8, is not absolute; exceptions exist. *Id.*

---

[2] In *State v. Stoneman*, 323 Or 536, 920 P2d 535 (1996), the Supreme Court wrote:

"If the enactment's restraint on speech or communication lies outside an historical exception, then a further inquiry is made—whether the *actual focus* of the enactment is on an *effect* or *harm* that may be proscribed, rather than on the substance of the communication itself. If the actual focus of the enactment is on such a harm, the legislation may survive scrutiny under Article I, section 8." *Id.* at 543 (emphasis in original).

The court went on to note that such a focus could be communicated either expressly within the text of a statute in terms of the harmful effects to be countered or implied through a statute's context. *Id.* at 544-45. In this case, the text of the 1995 administrative rules do not specifically describe the prohibited license plate choices in terms of harmful effects. A contextual analysis allows me to infer only that the prohibition against certain words on license plates is meant to spare the public from that which a reasonable person could find objectionable. *See* OAR 735-046-0010(8) (1995) (In determining whether a plate choice is prohibited under the rule, "[t]he plate choice shall be considered to be the most *objectionable* denotation or connotation that *reasonably* may be ascribed to it.") (emphasis added). As *Stoneman* states, however, the harm or effect at issue must be one that "may be proscribed" in the first place. Given the premium that our state constitution places on freedom of expression, the fact that some communication may be deemed "objectionable" is not an effect warranting state efforts to scour it from the discourse of the general public. That same communication, however, when it emanates from a state speaker, may be incompatible with an official office or function and therefore receives less deferential treatment, as I shall discuss shortly.

The first *Robertson* exception is for "historical" limitations on speech. This exception recognizes content-based restraints on expression that were already established when the Bill of Rights was adopted and to which neither the guarantees of that document nor those of the Oregon Constitution of 1859 was intended to reach. *Robertson,* 293 Or at 412. As petitioner correctly notes, the elements around which DMV rules revolve—license plates, automobiles, etc.—are part of a forum too contemporary to allow the regulations that control them to find sanctuary as a historical exception.

A second exception is the "incompatibility exception" articulated in *In re Lasswell,* 296 Or 121, 125-26, 673 P2d 855 (1983). That exception acknowledges that some limitations on speech are valid when a speaker's message is incompatible with the speaker's public function. *Id.* The issue in *Lasswell* stemmed from statements that a district attorney had made in newspaper and television interviews regarding facts behind a major drug investigation and the arrests that followed it. *Id.* at 123. As a result of his statements, the district attorney was charged by the Oregon State Bar (the Bar) with violating DR 7-107(B), a disciplinary rule that forbade prosecutors from making certain extra-judicial comments in public regarding the prosecution or defense of a criminal matter prior to trial. *Id.* On appeal, the district attorney raised an Article I, section 8, challenge to the rule, arguing that as interpreted by the Bar, the rule violated his right to free speech. In upholding the rule's constitutionality, the Supreme Court found that DR 7-107(B) was not an outright prohibition on discussion generally, but was, rather, an enactment that focused on the incompatibility between an "official function" and speech that, though privileged, nevertheless vitiated the proper performance of that function. *Id.* at 125. In effect, the court "recognized that there are some activities that lawmakers could not forbid citizens generally from doing, but that they may declare to be incompatible with the *role and work* of a public official." *Meltebeke v. Bureau of Labor and Industries,* 322 Or 132, 156 n 4, 903 P2d 351 (1995) (Unis, J., specially concurring) (emphasis added).

The paradigm of that exception has, up until now, concerned expression by an individual working in an official public capacity, *e.g.*, elected officials, public employees, and

state licensed professionals, that was incompatible with the individual's *official role in the public forum*.[3] The gravamen of the exception, however, was the character of the speech as official public speech, not necessarily that the speaker was an individual working in an official public role. For example, the speech at issue in *Lasswell* carried both private and public expressive content, like the situation here. Both types of comments were made by one individual. However, because the district attorney spoke as part of his official public role, the speech was considered to represent that official public role. Thus, Article I, section 8, tolerated the Bar's curtailment of the district attorney's incompatible private expression *because* the overriding nature of the speech pertained to an official public role. Here, the distinctions are that the speech contained in the license plate is made by an agency and an individual, and that the license plate expresses the agency's official public identification of the vehicle and a private individual's message. However, those distinctions are without a difference where the principle of the exception rests on the overriding nature of the speech as pertaining to an official public role. I believe that the incompatibility exception is applicable where license plates are partially speech pertaining to the official public role of DMV.

The entire process of assigning automobile license plates is undoubtedly an official function of the state. The very content of a license plate operates to officially identify a vehicle. The legislature has mandated that "the Department of Transportation *shall select* registration plates it issues." ORS 803.535 (emphasis added). As components of this selection process, the legislature has made the department responsible for determining the size, form, arrangement and material of the plates. ORS 803.535(1). It has also required that if plates are issued, the department is responsible for

---

[3] *See, e.g., In re conduct of Schenck,* 318 Or 402, 870 P2d 185 (1994) (circuit court judge); *In re Fadeley,* 310 Or 548, 802 P2d 31 (1990) (state Supreme Court justice); *Oregon State Police Officers Assn. v. State of Oregon,* 308 Or 531, 783 P2d 7 (1989) (state police officers); *Cooper v. Eugene School Dist. No.4J,* 301 Or 358, 723 P2d 298 (1986) (public school teacher); *In re Lasswell,* 296 Or 121, 673 P2d 855 (1983) (district attorney); *Miller v. Board of Nursing,* 115 Or App 84, 836 P2d 749, *rev den* 314 Or 727 (1992) (state-licensed nurse); *Koch v. City of Portland,* 94 Or App 484, 766 P2d 405 (1988), *rev den* 308 Or 79 (1989) (municipal police officer).

providing the means of vehicle identification by way of characters on the plates. ORS 803.535(1)(b). Those statutes underscore the fact that ultimately, the burden of who gets what license plate falls on the state. Under ORS 805.240, the Department of Transportation is authorized to issue customized registration plates on request, but only if the plates meet the requirements of ORS 803.535. I assume that that includes the requirements mentioned above, placing the onus of plate selection squarely on the department. The menu of choices available to the general public for custom plates may be large or it may be small, but ultimately, for the state to comply with ORS 803.535, it must stamp that choice with its imprimatur of approval.[4]

OAR 735-046-0010 (1995) merely prohibits messages that are incompatible with an official state function. The context of the rule reveals an intent to spare the public from expression that a reasonable person could find objectionable. *See* OAR 735-046-0010(8) (1995) (In determining whether a plate choice is prohibited under the rule, "[t]he plate choice shall be considered to be the most *objectionable* denotation or connotation that *reasonably* may be ascribed to it.") Obviously, that type of communication is not the sort that lawmakers could generally forbid citizens in this state to engage in. It is, however, the kind of communication that could be declared incompatible with an official role and that lawmakers could, therefore, generally prohibit the state from engaging in.

In *In re Fadeley,* the Supreme Court articulated the test for determining incompatibility. The court first noted that in making such a determination, the interests juxtaposed against Article I, section 8, expression need not be constitutional in magnitude in order for the expression in question to be incompatible with an official function. 310 Or at 564. Rather, the court declared that the question that must be asked is whether the offsetting societal interest—to which

---

[1] The reason why an individual wants a vanity license plate is that the license plate bears the imprimatur of the state. Petitioner wants the state's endorsement of his message. Petitioner could put any bumper sticker on his vehicle that he desires, including one that looked like an Oregon license plate but displayed the words WINE, VINO, or INVINO. However, such a bumper sticker would not satisfy petitioner's desire to have the state endorse the words he chooses to display.

we would subjugate the right to speak freely in that narrow circumstance—is of the *same degree of fundamental importance* as concerns expressed in the constitution. In *In re Fadeley,* the court found that the appearance of judicial integrity was important enough to trump a Supreme Court justice's right to make direct requests for contributions to his re-election campaign. *Id.*

Here, the manner in which state government may be perceived by those it serves is once again implicitly at issue. DMV's only fault here has been to anticipate as much and respond by attempting to be as inoffensive as possible. Article I, section 1, provides that *"all power is inherent in the people,* and all free governments are founded on *their* authority, and instituted for *their* peace, safety, and happiness." (Emphasis added.) In a small but important way, the state has acknowledged that authority by placing a bar on its own mouth. It has determined that in serving the people of Oregon, DMV will, to the best of its ability, refrain from issuing license plate messages that reasonable women and men could find objectionable. By discharging that official function with concern for the sensibilities of the public, DMV does not act as an arbiter of public discourse.

I also note that DMV's role in selecting and assigning license plates is part of Oregon's Vehicle Code, ORS chapters 801 to 826. The policy of that code includes providing for the "maximum safety for all persons who travel or otherwise use the public highways of this state." ORS 801.020(11)(a). To that end, the state has developed rules of the road that prohibit, for example, the operation of a vehicle by a person while that person is under the influence of intoxicants. In this instance, if the court requires the state to issue these license plates, the state could appear to condone conduct—driving under the influence of intoxicants (DUII)—which it otherwise clearly prohibits. Such an order would be incompatible with DMV's official state function to promote traffic safety.

It is easy to conceive of another situation where limiting DMV's role in approving license plate requests would lead to an inconsistent approach to promoting traffic safety. For example, I can envision a derogatory racial, ethnic, national origin, or gender message on a license plate that

would enrage another person and cause that person to drive in a dangerous fashion—perhaps speeding to catch up to that vehicle or following too closely behind it—to communicate that person's displeasure to the driver of the vehicle. Following too closely behind another car and driving over the speed limit are prohibited under the vehicle code, as are many other actions that an enraged driver might commit. By allowing DMV to prohibit offensive content on state-issued vehicle license plates, the court allows DMV to eliminate some conditions that might incite enraged and dangerous driving and lessen traffic safety. Requiring DMV and, in effect, the state itself to utter offensive speech through the form of state issued license plates would be incompatible with the state's function of promoting safe driving.

Obviously, I believe that the incompatibility analysis is appropriate in this setting. I must, however, acknowledge that to date the exception so far has been applied only where a single individual acting in the public sector formulates the content of the speech. Here, in this situation, the actual content of the speech is formed by a state agency and a private individual. The conclusion that the focus of the exception turns more on the essential nature of the speech rather than on the utterer of the speech is frankly an issue of first impression for this state. However, a decision to apply the incompatibility exception in this instance would not be formed in a vacuum. Federal case law provides an instructive template that is helpful in light of the paucity of Oregon law directly on point. The United States Supreme Court has recognized that "when the State is the speaker, it may make content-based choices." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 US 819, 833, 115 S Ct 2510, 2518, 132 L Ed 2d 700 (1995). That notion is derived, in part, from an earlier decision by the Court in which it concluded that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust v. Sullivan*, 500 US 173, 194, 111 S Ct 759, 114 L Ed 2d 233 (1991). In this case, the essence of the speech fulfills one of DMV's official public roles—identifying vehicles. DMV has, in turn, established legitimate limits in accomplishing that goal.[5] Employing the incompatibility exception, as I suggest

---

[5] A government's ability to determine the content and scope of its own speech is, of course, not without limits. As the Oregon Supreme Court has noted,

here, would allow the court to acknowledge that self-limiting aspect of governance while remaining true to this state's jurisprudence of free expression. The ALJ did not err in finding that DMV rules did not violate Article I, section 8.

Accordingly, I concur with the lead opinion's decision to affirm.

**LANDAU, J., dissenting.**

Were we writing on a clean slate, I would agree that the state has the authority to limit what an individual may select for the identifying characters of a custom license plate. A license plate is, after all, at least in part, state "speech," and it makes no sense to me that, merely because it is also to some extent the individual's speech, the state's authority suddenly becomes irrelevant. In my view, just as the state cannot force an unwilling individual to be associated with a particular message, neither should the individual be able to force the state to be associated with a particular message.

The problem is that we do not write on a clean slate. It must be acknowledged that the foregoing cannot be reconciled with the doctrine of *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), and its progeny, which provides that, unless a law directed at the content of an individual's speech is wholly contained within a historical exception, it is unconstitutional. There can be no question but that the state is regulating the communicative content of the requested license plate. Likewise, there can be no question but that the regulation of license plates does not fall within a historical exception. The answer, ineluctably, is that the state cannot regulate the content of custom license plates.

A majority of this court attempts to have its proverbial cake and eat it, by offering various ways of avoiding what

---

"assuming governments may engage in some forms of speech, they are still prohibited from advocacy intended to perpetuate themselves in power." *Burt v. Blumenauer,* 299 Or 55, 67, 699 P2d 168 (1985). At the federal level, the United States Supreme Court has recognized that government cannot choose to refrain from subsidizing some speech because it expresses politically dangerous ideas. *Reagan v. Taxation With Representation of Wash.,* 461 US 540, 548, 103 S Ct 1997, 76 L Ed 2d 129 (1983). It has also stated that government cannot "invidiously discriminate" in its choice of what speech to sponsor. *Cammarano v. United States,* 358 US 498, 513, 79 S Ct 524, 3 L Ed 2d 462 (1959).

the *Robertson* analysis seems so plainly to require. I find none of those avoidance rationales to be persuasive.

In the lead opinion, Judge Armstrong argues that *Robertson* simply does not apply. The lead opinion cites no authority for that remarkable assertion that *Robertson* does not apply to a state regulation of the content of an individual's speech. It simply declares that, although the regulation of the content of custom license plates is the regulation of an individual's speech, the concomitant state interest in the subject allows us to treat the regulation *as if* it did not regulate the content of an individual's speech.

In my view, what is clearly a regulation of an individual's speech does not become something else merely because of the state's interest. Regardless of whether the state's interest is legitimate, the individual's speech remains what it is. And under *Robertson*, the state's regulation of that speech is unconstitutional unless wholly contained within a historical exception.

In a concurring opinion, Judge Edmonds similarly concludes that *Robertson* does not apply, because, at the precise temporal point of state regulation, the license plate reflects only state speech. In my view, his reasoning fails to recognize that the practical effect remains the state regulation of individual speech, to which *Robertson* applies.

Finally, in another concurring opinion, Judge Wollheim argues that *Robertson* does apply, but the state's regulation nevertheless is authorized under the "incompatibility exception." I agree with the lead opinion that what Judge Wollheim proposes is an unprecedented extension of the exception.

Perhaps more plainly stated, what each of the other opinions in this case proposes is a significant rewriting of *Robertson*. That is a fairly ambitious move for this court, one that I would have thought more properly rested with the judgment of the Supreme Court. To be sure, I have no objection to suggesting to that court a particular approach, one that might require some modification of current law. But it strikes me as another thing altogether simply to assume the task of rewriting Oregon constitutional law ourselves.

I respectfully dissent.

Haselton, J., joins in this dissent.