Argued and submitted October 6, 2015; resubmitted en banc May 17, affirmed
on appeal, cross-appeal dismissed as moot June 28; petition for review denied
November 9, 2017 (362 Or 175)

OREGON NATURAL
RESOURCES COUNCIL FUND,
dba Oregon Wild,
*Plaintiff-Respondent,*
*Cross-Appellant,*

*v.*

PORT OF PORTLAND,
*Defendant-Appellant,*
*Cross-Respondent.*

Multnomah County Circuit Court
130913593; A156024

398 P3d 923

Matthew J. Kalmanson argued the cause for appellant-cross-respondent. With him on the briefs were Karen O'Kasey and Hart Wagner LLP.

Thomas M. Christ argued the cause and filed the briefs for respondent-cross-appellant.

Before Hadlock, Chief Judge, and Armstrong, Ortega, Sercombe, Duncan, Egan, DeVore, Tookey, Garrett, DeHoog, and Shorr, Judges, and Flynn, J. pro tempore.

## DUNCAN, J.

Defendant Port of Portland (the Port) appeals a judgment declaring that the Port violated Article I, section 8, of the Oregon Constitution when it rejected a proposed advertisement that plaintiff Oregon Natural Resources Council (Oregon Wild) wanted to run at Portland International Airport (PDX). The circuit court reasoned that the Port's advertising policy impermissibly restricts the content of speech by prohibiting political but not commercial advertisements— a ruling based largely on our decision in *Karuk Tribe of California v. TriMet*, 241 Or App 537, 251 P3d 773 (2011), *aff'd by an equally divided court*, 355 Or 239, 323 P3d 947 (2014), in which we held that TriMet had violated Article I, section 8, when it similarly restricted advertisements on the side of public busses. On appeal, the Port argues that this case is distinguishable legally and factually from *Karuk Tribe* because (1) the Port's advertising policy is not a "law" for purposes of Article I, section 8 (an argument that *Karuk Tribe* did not address); (2) even if the policy is a law, it does not regulate speech based on content but rather based on concerns inherent in managing an international commercial airport, which are very different from concerns about the outside of busses; and (3) even if the policy is a law that regulates speech based on content, the restrictions nonetheless fall within a well established historical exception for municipal corporations acting in a proprietary rather than governmental capacity.

Oregon Wild responds that this case is moot, because its advertisement has run and it has no present plans to run it again. As for the merits, Oregon Wild argues that we should follow *Karuk Tribe*, reject any arguments that are not directly controlled by that case, and affirm the circuit court's declaratory judgment.

As discussed more fully below, we are not persuaded that the case is moot, and we therefore proceed to the merits of the Port's appeal. On the merits, we agree with Oregon Wild that the Port's arguments do not yield a different result from *Karuk Tribe* and, adhering to our reasoning in that case, affirm the circuit court's declaratory judgment.[1]

---

[1] Oregon Wild filed a protective cross-appeal concerning the circuit court's declaration that the Port's policy does not violate the First Amendment to the

## I. BACKGROUND

The relevant factual background for this appeal is not in dispute. The Port is a port district and municipal corporation created in 1891. *See generally Cook v. The Port of Portland*, 20 Or 580, 27 P 263 (1891) (describing the creation of the Port). The Port's purpose is to promote its maritime, shipping, aviation, commercial, and industrial interests, and it is authorized to acquire and convey property, contract with third parties, and generally "do any other acts and things which are requisite, necessary or convenient in accomplishing the purpose described or in carrying out" that purpose. ORS 778.015. The Port owns and operates PDX.

In 2008, the Port adopted Ordinance No. 423-R, which regulates the operation of PDX. Section 1.1.8 of the ordinance states that the Port finds that "[e]stablishing reasonable Regulations at its Airports limiting commercial and noncommercial activity within the Airport are essential." To that end, section 4.1.1 delegates authority to the Port's director to "adopt Rules governing the operation of Airport facilities for each Port airport."

In accordance with section 4.1.1, the Port adopted the "Portland International Airport Rules." Chapter 13 of those rules concerns "Advertising, Promotion and Signage." Under that chapter, private parties are permitted to lease advertising space at the airport, but there are restrictions on the content of the advertisements. Most significantly, for purposes of this case, the Port "does not permit the placement of advertising materials at the Airport that contain * * * religious or political messages."[2]

---

United States Constitution, but it asserts that we need not reach the cross-appeal in the event that we affirm the declaratory judgment as to Article I, section 8. Thus, in light of our resolution of the Port's appeal, we dismiss the protective cross-appeal as moot.

[2] Paragraph 2 provides, in full:

"The Port does not permit the placement of advertising materials at the Airport that contain: (a) religious or political messages; (b) content that violates the intellectual property rights of another; (c) messages or images that are deceptive or misleading; (d) messages or images that depict physical violence against a person or an animal; (e) content prohibited by law or a court order; or (f) aromatic or scented displays. These restrictions are intended to: (i) maintain neutrality on religious and political issues; (ii) avoid creating discomfort for the travelling public potentially generated by controversial

In 2013, Oregon Wild submitted a request to lease advertising space at PDX. The proposed advertisement contained a photograph of a tree-covered mountaintop, part of which had been clear cut. The caption read, "Welcome to Oregon[—]Home of the Clearcut." (Uppercase altered.) The advertisement also included a website address, www.ClearCutOregon.com.

The Port denied Oregon Wild's request, deeming the advertisement to be "political advertising." The Port invited Oregon Wild to apply instead for a permit for free speech activities, which the Port allowed in certain areas of PDX.[3] Oregon Wild declined that invitation and filed this action for writ of review and declaratory relief, alleging, among other things, that the Port's rejection of the advertisement, based on its content, violated the free-speech guarantees in Article I, section 8, of the Oregon Constitution and the First Amendment to the United States Constitution.

Following the return of the writ and the record, the parties filed cross-motions for summary judgment. The cross-motions addressed the import of our decision in *Karuk Tribe*, review of which was pending at that time in the Supreme Court. Because that decision frames the parties' arguments below and on appeal, we pause to summarize it.

In *Karuk Tribe*, the question before us was whether TriMet, a mass transit district, had violated Article I, section 8, by rejecting the petitioners' proposed advertisement based on a policy that allowed commercial but not political advertisements on the sides of its vehicles. TriMet defended its advertising policy on two grounds, both of which related to TriMet's proprietary functions as a municipal

---

topics; (iii) avoid the potential for violating the Establishment Clause of the U.S. Constitution which prohibits a public entity from advancing religion; and (iv) prevent a potential reduction in income earned from selling advertising space, because commercial advertisers would be dissuaded from using the same forum commonly used by those wishing to communicate controversial, political or religious messages."

[3] The ordinance includes a provision that addresses "Free Expression" and authorizes the Port's director to designate areas in the airport for such activities. A separate chapter of the Airport Rules (Chapter 8) addresses "Free Speech" and sets out a permitting process for conducting free speech activities on airport property.

corporation.[4] First, TriMet argued that the framework set
out in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982),
for evaluating Article I, section 8, claims—a framework in
which regulations based on the content of expression are
impermissible unless wholly confined to a historical excep-
tion—should not apply to TriMet's policy because it was
acting in its proprietary rather than regulatory capacity
as a transit district. That is, notwithstanding *Robertson*,
TriMet urged the court to construe Article I, section 8, to
"allow government-drawn distinctions based on the content
of expression where the government acts in its proprietary
capacity." *Karuk Tribe*, 241 Or App at 546.[5] Second, in its
reply brief, TriMet advanced the alternative argument that,
even if the *Robertson* framework were to apply, a similar
"government as proprietor" distinction puts TriMet's adver-
tising policy restrictions within a well-established historical
exception to the reach of Article I, section 8. *Karuk Tribe*,
241 Or App at 548.

We rejected both of those "government as propri-
etor" arguments. The first we rejected on the merits, con-
cluding that "TriMet's arguments before us that this is not a
*Robertson* case are unpersuasive." *Karuk Tribe*, 241 Or App
at 547. The second, however, we concluded had been raised
too late in the litigation. We explained that "[w]e do not
reach the merits of that [historical exception] argument for
two reasons: not only did TriMet fail to preserve that argu-
ment below, but, as we have often had occasion to remind

---

[4] *Karuk Tribe* also involved a challenge under the First Amendment to the
United States Constitution, which we declined to address. 241 Or App at 540, 540
n 3.

[5] We summarized TriMet's contentions this way:

"[TriMet] contends that we should not apply that [*Robertson*] framework—in
essence, that we should ignore binding Supreme Court precedent—because
(1) the court in *Robertson* 'was not thinking about governmental proprietor-
ship when it issued its decision'; (2) 'there is a fundamental inconsistency
between *Robertson*'s "non-content" approach and "forum analysis" "reason-
able viewpoint neutral" content-based perspective'; and (3) it would make lit-
tle sense to 'compel governments acting as property owners[,] when opening
up previously closed forums[,] *** to try and fit their forum into the second
*Robertson* category.' We understand TriMet to argue that *Robertson*'s reach
does not extend to circumstances where a government acts in its proprietary
capacity ***."

*Karuk Tribe*, 241 Or App at 547 (third and fourth brackets in *Karuk Tribe*).

others, a party may not raise an issue for the first time in a reply brief." *Id.* at 548 (internal quotation marks, alterations, and citations omitted).

In the process of rejecting those arguments, we also identified but did not address yet another possible "government as proprietor" issue under Article I, section 8—that is, whether TriMet's advertising policy was even a "law" for purposes of that constitutional provision. We noted:

> "TriMet does not contend that an advertising policy adopted by a governmental officer that only affects contractual relationships of that government does not enact or implement a 'law' under Article I, section 8. Indeed, TriMet eschewed any such contention at oral argument. * * *. Neither we nor the Supreme Court have decided whether a governmental policy adopted by an executive officer that only affects contractual relationships of that government, and does not enact or implement a general rule of civil conduct, qualifies as a 'law,' whose enactment or enforcement is constrained by Article I, section 8. It may be that the relevant 'law' here is ORS 267.140(2), empowering the general manager to adopt the policy in question. As we have said, however, any legal distinction about the meaning of a 'restricting' or 'restraining' 'law' under Article I, section 8— although related to TriMet's 'government as proprietor' thesis—is outside the legal questions presented to the reviewing court below and advanced on appeal."

*Karuk Tribe*, 241 Or App at 547 n 7.

In October 2011, the Supreme Court allowed review of our decision, and it remained pending in that court at the time that Oregon Wild and the Port filed their summary judgment motions in this case in 2013. In its motion, Oregon Wild argued that this case was "nearly identical" to *Karuk Tribe*: "The issue in both cases is whether the government can regulate the content of advertising on government-owned property that has been opened to the public for that purpose." Oregon Wild urged the circuit court to simply follow that decision—at least until the Supreme Court said otherwise.

The Port, in its cross-motion, argued that *Karuk Tribe* resolved only one of the grounds upon which the Port

defended its advertising policy. The Port's motion advanced four bases for granting summary judgment in its favor under Article I, section 8: (1) The Port's advertising policy is not a "law," and therefore Article I, section 8, does not apply; (2) the *Robertson* framework does not apply because the Port was acting in a proprietary rather than regulatory capacity; (3) even if *Robertson* applies, the Port's policies are reasonable time, place, and manner restrictions that regulate, not proscribe, speech at PDX; and (4) again assuming *Roberson* applies, the advertising policy falls within a historical exception for conduct taken by a municipal corporation acting in its proprietary capacity. Only the second argument, the Port argued, was controlled by our decision in *Karuk Tribe*, and the rest were open questions—the first and fourth, expressly so.

In its letter opinion on the cross-motions, the circuit court ruled in favor of Oregon Wild. The court explained:

> "The protection given to freedom of speech by Article I, Section 8 of the Oregon Constitution has its own body of case law. I am persuaded that this case is controlled by [*Karuk Tribe*]. Defendant argues that, at the time of adoption of the Oregon Constitution in 1857, the framers had in mind an exception to the freedom of speech guarantee for governments to limit speech on premises operated in their proprietary capacity. There is a heavy burden on [the Port], which proposes to restrict speech, to demonstrate the existence of this exception. The cases and examples cited by [the Port] do not satisfy this burden.
>
> "Unless the Oregon Supreme Court tells us otherwise when it decides *Karuk Tribe*, [the Port's] policy regulates the content of speech and not simply its effects. For that reason, plaintiff is entitled to the relief sought under the Oregon Constitution."

The court then entered a judgment, in accordance with its ruling, declaring that the Port "violated Article I, section 8, of the Oregon Constitution * * * when it rejected [Oregon Wild's] proposed advertisement, as alleged in [Oregon Wild's] complaint." The judgment further stated, "in accordance with the writ of review statutes, ORS 34.010 to 34.102, the court reverses [the Port's] decision to reject the advertisement and, instead, orders [the Port] to accept it."

The Port subsequently filed its appeal and, before the parties had filed their briefs, the Supreme Court issued its decision in *Karuk Tribe*—a per curiam opinion that affirmed by an equally divided court, with only six justices participating. 355 Or 239. Shortly after that decision, the Port asked this court to certify the case directly to the Supreme Court, so that the issues presented in *Karuk Tribe* could be addressed by a full seven-member court. Oregon Wild opposed the motion, asserting, first and foremost, that the case was now moot because the advertisement in question had already run. Oregon Wild asserted:

> "The ad is no longer running, and [Oregon Wild] no longer wants to run it, in part because it costs money to run it, and in part because the message is no longer timely, in [Oregon Wild's] view. Advertising campaigns have a season, and this one has passed, [Oregon Wild] has concluded."

After further briefing on the question of mootness, the Chief Judge of this court issued an order concluding that "the action remains justiciable, notwithstanding that Oregon Wild is no longer running the political advertisement that gave rise to this declaratory relief action, because the trial court granted relief and issued a declaration of rights that are continuing in nature."

In the wake of that order, our full court denied the motion to certify the appeal to the Supreme Court, and the parties proceeded to brief and argue the case. In its assignments of error, the Port argues that the circuit court erred in granting Oregon Wild's motion for summary judgment and in denying the Port's cross-motion, for reasons that echo the four articulated in the circuit court. In response, Oregon Wild disagrees on the merits as to each argument, but it also asks us to revisit the question of mootness, considering that Oregon Wild is not running the advertisement and has no present plan to ever run it again.

## II. ANALYSIS

A. *Mootness*

Before turning to the merits of the Port's appeal, we briefly address Oregon Wild's renewed assertions regarding

mootness. According to Oregon Wild, the Chief Judge erred in determining that the circuit court had granted "continuing" relief; rather, according to Oregon Wild, the judgment provided a retrospective declaration of rights—that the Port "violated (past tense)" Oregon Wild's constitutional rights—and granted prospective relief—directing that the Port accept the advertisement for display. According to Oregon Wild, the violation and the once-prospective remedy are both in the past, and there is no "continuing" controversy now that Oregon Wild has decided not to keep running the advertisement.

We are not persuaded by that argument. In its initial pleading, Oregon Wild sought "a judgment declaring that defendant's decision to reject plaintiff's advertisement was unconstitutional or otherwise unlawful, and that any ordinance or rule authorizing the decision is, to that extent, invalid." Oregon Wild then sought summary judgment and obtained an order "grant[ing] plaintiff's motion on those parts of plaintiff's claims that relate to Article I, section 8, of the Oregon Constitution." The judgment that was entered declared that "defendant violated Article I, section 8, of the Oregon Constitution *** when it rejected plaintiff's proposed advertisement, as alleged in plaintiff's complaint." It further ordered the Port to accept Oregon Wild's advertisement.

As a result of that judgment, the Port has a present obligation to accept Oregon Wild's advertisement, should Oregon Wild want to display it. As the Port points out, Oregon Wild is not abandoning its legal rights under the judgment; rather, it acknowledges the possibility that it could run the same or a similar advertisement in the future. Moreover, even if the judgment does not expressly declare the Port's advertising policy invalid with regard to any prohibition on political advertising, it has that practical effect—at the very least, as between these parties. That is, viewed in the context of the pleadings and litigation as a whole, the judgment has the practical effect of allowing Oregon Wild to submit *any* political advertisement, because the court ruled that the advertising policy unconstitutionally distinguished between commercial and political speech. Thus, we are not persuaded by Oregon Wild's contention that the case is moot simply

because it no longer has a present plan to run the particular advertisement in question. *See WaterWatch of Oregon, Inc. v. Water Resources Dept.*, 259 Or App 717, 726, 316 P3d 330 (2013) (the party seeking dismissal has the burden to establish that the case is moot).[6] Thus, we proceed to the merits of the Port's appeal.

B. *Merits*

1. *Is the Port's policy a "law" for purposes of Article I, section 8?*

The Port's defense of its advertising policy begins with an argument similar to the one we identified, but that had not been raised, in *Karuk Tribe*—that is, that the Port's rejection of Oregon Wild's advertisement does not even implicate Article I, section 8, because the policy does not involve the "passing" of a "law" within the meaning of that provision. More specifically, the Port contends that its advertising policy, and its consequent decision not to place Oregon Wild's advertisement, were proprietary, administrative functions not subject to that constitutional provision.

The Port's argument puts at issue the meaning of a provision of the original state constitution, which we consider by "examining the text of the provision in context, the historical circumstances of the adoption of the provision, and the case law that has construed it." *State v. Mills*, 354 Or 350, 353, 312 P3d 515 (2013) (citing *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992)). "[O]ur goal is to determine the meaning of the constitutional wording, informed by general principles that the framers would have understood were being advanced by the adoption of the constitution." *Id.* (citing *State v. Savastano*, 354 Or 64, 72, 309 P3d 1083 (2013)).

With that aim, we turn first to the text of Article I, section 8, which states:

---

[6] Because we conclude that the case is not moot, we do not address the Port's contention that, even if moot, the court should nonetheless consider it as a case of public importance. *See Eastern Oregon Mining Association v. DEQ*, 360 Or 10, 15, 376 P3d 288 (2016) (Article VII (Amended) of the Oregon Constitution does not require courts to dismiss cases whenever they are moot, "at least not in 'public actions or cases involving matters of public interest'" (quoting *Couey v. Atkins*, 357 Or 460, 520, 355 P3d 866 (2015)).).

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The parties' specific disagreement hinges on what is included within the "passing" of a "law." Although the term "law" has never been easily defined in isolation,[7] its juxtaposition with the word "passed" would have been understood in the late 1850s, as it is today, to include legislative acts. Noah Webster's 1828 dictionary defined "law" to include "[a] rule, particularly an established or permanent rule, prescribed by the supreme power of a state to its subjects, for regulating their actions, particularly their social actions." Noah Webster, 2 *An American Dictionary of the English Language* (1828) (unpaginated). The same dictionary defines "pass" in relation to laws:

"14.   To approve or sanction by a constitutional or legal majority of votes; as the house of representatives *passed* the bill. Hence,

"15.   To enact; to carry through all the forms necessary to give validity; as, the legislature *passed* the bill into a law."

*Id.* (emphasis in original). Conversely, Webster defined "legislation" as "[t]he act of passing a law or laws; the enacting of laws." *Id.*

Thus, the "passing" of a "law" would have been understood by the framers in its most general sense to include the

---

[7] *See State v. Cloutier*, 351 Or 68, 75, 261 P3d 1234 (2011) ("[T]he term 'law' fairly 'drips with ambiguity.' Jerome Frank, *Courts on Trial* 66 (1950). Bryan Garner has identified no fewer than nine different senses in which the word 'law' is commonly used, including a broad reference to the aggregate of all legislative, administrative, and judicial action, as well as a more narrow reference to statutes alone. Bryan A. Garner, *A Dictionary of Modern Legal Usage* 503-04 (2d ed 1995)."). The dictionaries that circulated contemporaneously with the adoption of Article I, section 8, reveal that the meaning of that term then was as varied—and potentially expansive—as it is today. *E.g.*, John Bouvier, 2 *A Law Dictionary Adapted to the Constitution and Laws of the United States of America* 7 (1839) (reprint 1993) ("[I]n its most general and comprehensive sense, [law] signifies a rule of action, and this term is applied indiscriminately to all kinds of actions, whether animate or inanimate, rational or irrational. 1 Bl. Com. 38. In its more confined sense, law denotes the rule, not of actions in general, but of human action or conduct.").

"enactment" of "[a] rule, particularly an established or permanent rule, prescribed by the supreme power of a state to its subjects, for regulating their actions, particularly their social actions." *Id.*; *see also Ogden v. Saunders*, 25 US 213, 347, 6 L Ed 606 (1827) (Marshall, J., dissenting) ("Law has been defined by a writer, whose definitions especially have been the theme of almost universal panegyric, 'to be a rule of civil conduct prescribed by the supreme power in a State.'").[8]

The Port, while acknowledging that "many of [the definitions of 'law' in Webster's 1828 dictionary] refer to formal enactments of government actors that regulate the conduct of citizens within their jurisdiction," argues that historical context further informs and limits the meaning of Article I, section 8, as it relates to the functioning of municipal corporations. Although there is no record of any specific

---

[8] Oregon Supreme Court decisions under Article I, section 8, although not directly addressing what constitutes "passing" of a "law," are at least consistent with our understanding that the provision applies to the government's enactment of rules regulating the actions of its subjects. *E.g., State v. Ciancanelli*, 339 Or 282, 292, 121 P3d 613 (2005) ("The first half of the provision is directed at the legislature and *other lawmaking bodies* ('No law shall be passed ***.')" (Emphasis added; omission in *Ciancanelli*.)); *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994) (holding, under Article I, section 8, that a city ordinance prohibiting the sale of expressive materials on city sidewalks was unconstitutional as applied); *City of Portland v. Tidyman*, 306 Or 174, 179, 759 P2d 242 (1988) (noting that earlier cases had "emphasized that the clause is addressed to lawmakers at the time they consider making a law and forbids the enactment of a law directed in terms against any subject of speech, writing, or printing that cannot be shown to fall within an old or modern version of a well-established historical exception that the constitutional guarantees demonstrably were not meant to displace").

We further note that, because we conclude that the Port's policy is the type of legislative enactment that the framers would have understood to come within Article I, section 8, we do not address whether Article I, section 8, could apply to *nonlegislative* acts by the Port or its agents. *Cf. State v. Clark*, 291 Or 231, 239, 630 P2d 810 (1981) (discussing a similarly worded prohibition in Article I, section 20 ("No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."); stating that "[i]t also was early established that the guarantee reaches forbidden inequality in the administration of laws under delegated authority as well as in legislative enactments"); *Savastano*, 354 Or at 91-92 (citing *Clark* and rejecting the state's argument that Article I, section 20, applies only to the legislature; explaining that, "[f]or over 100 years, this court has recognized that Article I, section 20, applies not only to the legislature but also to other branches of government"); *see also In re Fadeley*, 310 Or 548, 574, 802 P2d 31 (1990) (Unis, J., concurring in part and dissenting in part) ("Article I, section 8, protects 'free expression of opinion' and 'speech' rights from intrusion by any branch of the government: the legislature, the executive and the judiciary.").

discussions of Article I, section 8, at Oregon's Constitutional Convention in 1857, *see Ciancanelli*, 339 Or at 308 (so stating), the Port points out that it was well established by the 19th century that municipal corporations were understood to act in dual capacities, proprietary and governmental. *See Simon v. Northrup*, 27 Or 487, 502, 40 P 560 (1895) ("A city occupies, as it were, a dual relation to the state—the one governmental or political, and the other proprietary or private."); *see also Noonan v. City of Portland*, 161 Or 213, 221, 88 P2d 808 (1939) (explaining that, historically, "the courts, in order to promote justice and to subject municipalities to liability where it was deemed that liability should be borne, made the distinction between governmental and corporate functions of municipalities"); *Blue v. City of Union*, 159 Or 5, 11, 75 P2d 977 (1938) ("Now, no matter how great nor how numerous may be the difficulties in distinguishing between these capacities, it is established law that when a corporation exercises a purely corporate and proprietary or private function, *such, for example, as the maintenance and operation of a municipal wharf or airport or public utility*, or water system, from which it derives a revenue, it is subject to suit without statutory authority, the same as any individual similarly engaged." (Emphasis added.)). According to the Port, it follows that the framers would have understood that acts undertaken by a municipal corporation in its proprietary capacity are necessarily something other than the kind of legislative acts prohibited by Article I, section 8.

The Port's argument presumes more than its proffered history demonstrates. Even if the framers were aware of and had a shared understanding of the "dual capacities" in which municipal corporations operated, there is no reason to believe that the framers understood those capacities to correspond to whether an act by a municipality was within the purview of Article I, section 8. In the context of public corporations, the court-recognized distinction between "governmental" and "proprietary" acts typically concerned whether a municipal corporation was acting as an agent of the state for the benefit of the state as a whole (referred to as its "governmental" or "political" capacity), or whether the municipal corporation was acting instead for the benefit of the local inhabitants (its "private" or "proprietary" capacity).

*See generally* Eugene McQuillin, 1 *The Law of Municipal Corporations* § 2:13, 199 (3d ed rev 2010) (explaining the distinction and stating that "[p]rivate powers of a municipal corporation are synonymous with the terms home rule and local self-government").[9] Nothing in the reasoning in the cases cited by the Port—which predominantly concern the legislature's ability to exercise control over a local government or the ability of a local government to partake of the state's sovereign immunity—naturally extends to the context of governmental interference with free expression, and the Port has not explained to us why the framers would have intended to give local governments greater latitude to restrict speech while acting in a proprietary capacity.[10] Thus, we decline the Port's invitation to employ a governmental/proprietary test to determine whether the Port's policy involves the passing of a law under Article I, section 8.

In a similar argument, the Port contends that the framers of Article I, section 8, would have appreciated the difference between municipal legislation and purely "administrative" acts of a municipal corporation. In support of that proposition, the Port relies on a discussion of "municipal legislation" in *Long v. City of Portland*, 53 Or 92, 101,

---

[9] The distinction, although well established in those contexts, has long been the subject of criticism—including around the time of the framing of our constitution. *E.g.*, Dillon, 1 *The Law of Municipal Corporations* § 10a, 97-98 (2d ed 1873) ("[T]hat a municipal corporation is in any just view a *private* corporation, or possesses a double character, the one private and the other public, although often asserted, is only true, if true at all, in a very modified, if not inaccurate, sense. In their nature and purposes, municipal corporations, however numerous and complex their powers and functions, are essentially public." (Emphasis in original.)); *Northwest Natural Gas Co. v. City of Portland*, 300 Or 291, 297-302, 711 P2d 119 (1985) (discussing the "less than tranquil life" of the governmental/proprietary distinction); *see also Clarke v. OHSU*, 343 Or 581, 595 n 6, 175 P3d 418 (2007) ("The distinction between governmental and proprietary functions, however, is not entirely clear from our previous cases.").

[10] Moreover, we see no evidence that the framers, even if aware of the "dual capacities" in which municipal corporations operated, would have understood municipal corporations to be passing laws only when acting in a governmental capacity. Nor have later cases correlated the governmental/proprietary distinction with whether a law has been passed; in fact, the Supreme Court has suggested that an ordinance can be passed in either capacity. *See City of Hillsboro v. Public Service Commission of Oregon*, 97 Or 320, 342, 192 P 390 (1920) ("It matters not, for the purposes of this case, whether the plaintiff was acting in its proprietary or governmental capacity in passing the ordinance embodying the franchise here in question. Whatever term may be applied to the transaction, the plaintiff put in motion a public utility supplying service to the public.").

98 P 1111 (1909), a case concerning Article IV, section 1a, of the Oregon Constitution. That constitutional provision, which was adopted as part of "Home Rule Amendments" in 1906, stated that "[t]he initiative and referendum powers reserved to the people by this constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special, and municipal legislation, of every character, in or for their respective municipalities and districts."

In *Long*, the court addressed a motion for rehearing by the City of Portland in a case in which the court had previously upheld a state statute enacted to carry out Article IV, section 1a. That statute had provided that "no city ordinance, resolution or franchise" would become operative until 30 days after passage by council and approval by the mayor. In denying the city's challenge on rehearing, the court addressed the city's concern that the statute would be "especially cumbersome to the prompt and expeditious transaction of municipal business." 53 Or at 100. The court dismissed those concerns, stating:

> "The effect of the referendum will not, however, affect in any manner ordinances or resolutions of the council that are not 'municipal legislation.' * * * *Legislation as here contemplated must be considered in the sense of general laws, namely, rules of civil conduct prescribed by the lawmaking power and of general application.*"

*Id.* at 100-01 (emphasis added). The court then cited a case from New Hampshire, *By Opinion of the Justices*, 66 NH 629, 33 A 1076 (1891), for the proposition that

> "the law is said to be a rule—*not a transient, sudden order to and concerning a particular person, but something permanent, uniform, and universal. The action of a municipal council may relate to questions or subjects of a permanent or general character, or to those which are temporary and restrictive in their operation and effect; and ordinarily an ordinance relates to the former, while the latter may be adopted by resolution.* The former must be enacted with all the formality required by the charter, while the latter may be adopted with less formality, and its legal effect determined less strictly, unless the charter otherwise provides."

*Long*, 53 Or at 101 (emphasis added). *Long* then continued:

"Whatever may be the requirement as to the form of enactment, the former is municipal legislation, while the latter is not. In *Shaub v. Lancaster City*, 156 Pa 362, 366, 26 Atl 1067, 1068 (1893), it is said: *'But there is a well-marked distinction between acts that are legislative, and that lay down a rule of action for the citizens or the city, and acts that relate to the daily administration of municipal affairs.* The latter may well be described as "business" to be transacted by councils, and may be properly left to them to dispose of by "order or resolution."' \*\*\* *Therefore much of the municipal business that might appear to be within the legislative act, and therefore embarrassed by the application of the referendum, is not in fact legislation within the meaning of Section 1a, Article IV, of the constitution, although included in the language of the statute."*

*Id.* at 101-02 (emphasis added).

Although Article IV, section 1a, and the Supreme Court's statements in *Long* post-date Article I, section 8, by nearly half a century, the Port argues that the core distinction discussed in *Long*—between administrative acts and municipal legislation—was well established by the mid-1800s. But, to the extent that the distinction is relevant to the meaning of Article I, section 8, it is consistent with the understanding of "passing" a "law" that we described above. That is, the distinction is drawn primarily between acts that, on the one hand, establish general rules of conduct or a "rule of action" by the citizens or the city (legislation), and acts that, on the other hand, are temporary and restrictive in their operation and effect. We therefore are not convinced that the framers, even if aware of that distinction, intended to depart, in the case of municipal corporations, from what we understand to have been included within the ordinary meaning of "passing" a "law" at the time that Article I, section 8, was adopted—that is, the enactment of a rule, particularly an established or permanent rule, prescribed by the government, for regulating the actions of its subjects.

The Port's policy comes within that ordinary understanding of "passing" a "law." The Port's policy, once again, states that "[t]he Port does not permit the placement of advertising materials at the Airport that contain [among other content] \*\*\* religious or political messages." That

prohibition is an established rule enacted by the government that regulates the conduct of anyone who seeks to place advertisements on the government's property. We therefore conclude that it is a "law" that has been "passed" by the Port for purposes of the prohibition in Article I, section 8.

2. *Does the* Robertson *framework apply to the Port's policy?*

The Port next contends that, even if the policy is a law, the *Robertson* framework "should not be used to examine laws regulating permissible uses of property." The Port concedes that "this argument was made and rejected in *Karuk Tribe*." We adhere to our decision in *Karuk Tribe*, 241 Or App at 546-47, and reject the Port's argument on this point without further discussion.

3. *Does the policy regulate speech under* Robertson?

Alternatively, assuming the *Roberston* framework applies to its advertising policy, the Port argues that the circuit court erred in concluding that the policy implicates the first category of that framework. We disagree.

Under *Robertson,* a law is classified under the "first category" if it is "written in terms directed to the substance of any 'opinion' or any 'subject' of communication." 293 Or at 412. If so, then the law is unconstitutional, unless the scope of the restraint is "wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *Id.*

In the Port's view, its policy is not directed at the substance of any opinion because the Port "is simply allocating opportunities that it has created for speech, based on the particular needs of an international commercial airport, and it does not prohibit speech at PDX based on content." But the challenged policy is not simply about speech opportunities; the text expressly regulates based on the *content* of particular advertisements, prohibiting religious and political content while allowing commercial content. *See State v. Babson*, 355 Or 383, 395, 326 P3d 559 (2014) ("[I]n analyzing

a law under the first category of *Robertson*, this court has looked to the text of the law to see whether it expressly regulates expression."); *Outdoor Media Dimensions v. Dept. of Transportation*, 340 Or 275, 287 n 8, 132 P3d 5 (2006) ("In general, the term 'content neutral' means that a particular restriction on expression applies to all expression, regardless of its subject or content. For example, a law or other government action that prohibits all signs that interfere with drivers' lines of sight near an intersection is 'content neutral,' *while a law that permits noncommercial (for example, political) signs but prohibits commercial signs is not content neutral.*" (Emphasis added.)). The circuit court properly characterized the policy under *Robertson*'s first category.

### 4. Does the policy fall within a well-established historical exception?

Finally, the Port argues that, even if analyzed under *Robertson*'s first category, the "'proprietary function' doctrine * * * is a well-established historical exception to rules that otherwise applied to state actors, and is a doctrine of constitutional significance." Relying on the same case law that it cited with regard to whether the framers would have understood a proprietary act by a municipal corporation to be a "law," the Port argues that "a Nineteenth Century court would have permitted a municipal corporation acting in its proprietary capacity to lease space to commercial interests as it saw fit, unburdened by the requirement of 'content neutrality.'"

We agree with the circuit court's conclusion that the Port did not establish that its content-based restriction was "wholly confined within some historical exception." *Robertson*, 293 Or at 412; *State v. Moyer*, 348 Or 220, 233, 230 P3d 7 (2010) (explaining that the question of historical exception "requires the following inquiries: (1) was the restriction well established when the early American guarantees of freedom of expression were adopted, and (2) was Article I, section 8, intended to eliminate that restriction"). As we explained previously, none of the principles in the "government as proprietor" case law naturally extend to the context of governmental interference with free expression, 286 Or App at 460-61, let alone demonstrate a "well

established" exception for the type of speech restriction at issue in this case.

## III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment that the Port's advertising policy violates Article I, section 8.

Affirmed on appeal; cross-appeal dismissed as moot.

**ARMSTRONG, J.,** concurring.

Applying the analytical framework established in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), and our decision in *Karuk Tribe of California v. TriMet*, 241 Or App 537, 251 P3d 773 (2011), *aff'd by an equally divided court*, 355 Or 239, 323 P3d 947 (2014), the majority concludes that restrictions imposed by the Port of Portland on the content of advertisements that the Port permits to be displayed at Portland International Airport violate Article I, section 8, of the Oregon Constitution. As I will explain, I believe that the Port's advertising restrictions do not violate Article I, section 8. I nonetheless concur in the decision to affirm the judgment in this case because, although I believe that *Karuk Tribe* was wrongly decided, I believe that we are bound by principles of *stare decisis* to adhere to it. Hence, it falls to the Oregon Supreme Court to correct our decision in this case.

The advertising restrictions at issue here are equivalent to those in *Karuk Tribe*. We held there that restrictions imposed by TriMet on the content of advertisements that TriMet would allow to be placed on its vehicles were subject to the *Robertson* analysis and, under that analysis, that the restrictions violated Article I, section 8. *Karuk Tribe*, 241 Or App at 545-48. We did not consider in *Karuk Tribe* whether the restrictions came within a well-recognized historical exception for restrictions imposed on expression by a municipal corporation acting in a proprietary capacity, because we concluded that TriMet had failed to timely raise the issue. *Id.* at 548.

Here, the majority addresses the proprietary-capacity argument on its merits and rejects it, together with a related argument that the Port's rules restricting the content of

advertisements at the airport should not be considered to be laws for purposes of the limitation imposed by Article I, section 8, against the enactment of laws that restrict expression. 286 Or App at 457-66. I agree with the majority's resolution of both of those issues.

However, I believe that we erred in *Karuk Tribe* in concluding that the *Robertson* analysis applied to the advertising restrictions at issue there and, by extension, to the restrictions at issue here. Our error stemmed from our failure to recognize that the principle under which we and the Supreme Court had upheld restrictions on the content of expression on custom license plates for motor vehicles in Oregon in *Higgins v. DMV*, 170 Or App 542, 13 P3d 531 (2000) (en banc), *aff'd*, 335 Or 481, 72 P3d 628 (2003), applied equally to the advertising restrictions at issue in *Karuk Tribe*.

We and the Supreme Court recognized in *Higgins* that custom license plates involve communication by both the state and the people who purchase them. However, because the state uses state-issued license plates to communicate information for a state purpose, Article I, section 8, does not limit the state's authority to control the communicative content of the plates, that is, to restrict the ability of people to use the plates to communicate.

We correctly recognized that aspect of *Higgins* in a footnote in *Karuk Tribe*, noting that,

"[w]here [a] challenged law regulates the legally compelled display of a message that the government creates for its own regulatory purpose, *Robertson* is inapplicable because the protection of Article I, section 8, does not inure to that speech."

*Karuk Tribe*, 241 Or App at 546 n 6 (citing *Higgins*, 335 Or at 490-91). I believe, however, that we failed in *Karuk Tribe* to recognize the broader principle embodied in *Higgins*. The broader principle is that there are circumstances in which the government can choose to create opportunities for people to communicate without making Article I, section 8, applicable to the government's decision to control the content of the communication. And, contrary to *Karuk Tribe*, I believe

that the opportunity that TriMet created for people to place advertisements on its vehicles comes within that principle, as does the equivalent decision by the Port to allow advertisements to be placed on airport property.

The state's decision to allow signs to be placed on the right of way of Oregon roads and highways to identify and help people locate Oregon wineries (and other businesses), that is, to advertise the businesses to the public, provides another example of the principle. *See* ORS 377.800, ORS 377.805 (authorizes placement of tourist and motorist information signs along highways); OAR 733-030-0006 (identifies qualifying businesses); OAR 733-030-0026, OAR 733-030-0036, OAR 733-030-0080 (imposes requirements for content of signs). The state can charge wineries for the opportunity to communicate with the public in that way and can control the content of the communication on the signs without regard to the strictures imposed on the state by Article I, section 8. In contrast, state restrictions on the content of communication on signs placed by Oregon wineries (and others) on private property adjacent to Oregon roads and highways *are* subject to Article I, section 8. *See, e.g., Outdoor Media Dimensions v. Dept. of Transportation,* 340 Or 275, 298-99, 132 P3d 5 (2006). Both regulatory regimes involve the imposition of state restrictions on the content of communication by others, but only the latter is subject to Article I, section 8.

In the same vein, the state's publication of the Voters' Pamphlet gives candidates and others the opportunity to communicate with Oregon voters about the merits and demerits of candidates and measures on each election ballot. The state imposes restrictions on the content of the statements that it allows to be published in the Voters' Pamphlet, *see, e.g.,* ORS 251.055(1); ORS 251.085; *State Voters' Pamphlet Manual* 9, 23 (2016) (adopted by OAR 165-016-0000), but its decision to do that does not implicate Article I, section 8. Of course, the imposition of state restrictions on communication about candidates and measures in most other contexts *is* subject to Article I, section 8.

At the risk of belaboring the point, the same principle would apply if the state chose to publish a magazine (or

to establish a public radio or television station) and solicited advertisements to help defray the cost of it. The state's exercise of control over the content of the advertisements would not implicate Article I, section 8.

In sum, the principle at issue here recognizes that Article I, section 8, does not limit the authority of the government to choose the information that it wishes to communicate in conjunction with its activities when, as here, the governmental activity is one in which the government can choose to bar all communication or to communicate only information of its choosing. Both TriMet and the Port can decide to communicate no information on their respective vehicles and the walls and other surfaces of their facilities or to communicate whatever information they wish to communicate on them. Article I, section 8, simply does not apply to those decisions.[1]

If the broad *Higgins* principle that I have identified is not correct, that is, if Article I, section 8, and *Robertson* apply to decisions to give people the opportunity to communicate through state license plates or to place advertisements on TriMet vehicles or at the Portland airport, then the affected governmental entities will be required to allow the communication in those settings of almost any message that anyone wishes to communicate—no matter how vulgar, offensive, or objectionable to people whom the governmental entities serve—because no historical exception or permissible effects-based restriction will provide the means to prevent that. *Cf. State v. Maynard*, 138 Or App 647, 656-59, 659 n 3, 910 P2d 1115 (1996) (Armstrong, J., concurring) (discussing permissible scope of effects-based laws restricting expression), *vac'd*, 327 Or 582, 964 P2d 264 (1998), *on remand*, 168 Or App 118, 5 P3d 1142 (2000), *rev den*, 332 Or 137 (2001). I do not believe that Article I, section 8, places Oregon governments in the position in which, if they choose

---

[1] It is worth noting, however, that the fact that Article I, section 8, does not limit the authority of the government to control the content of advertising in the circumstances presented in *Karuk Tribe* and here does not mean that there are no constitutional constraints on that authority. Other constitutional provisions, both state and federal—for example the guarantee of equal treatment in Article I, section 20, and of free expression in the First Amendment—will serve to constrain that authority.

to allow people to communicate in circumstances such as those presented in *Higgins*, *Karuk Tribe*, and here, the governments will have no meaningful ability to control the content of the communication. Nonetheless, that is the position in which *Karuk Tribe* has placed them.

Although I believe that *Karuk Tribe* was wrongly decided, our case law on *stare decisis* leads me to conclude that it is the Supreme Court, rather than our court, that will have to correct the error. Hence, I concur in the decision to affirm the judgment in this case.